THE HONORABLE RICHARD A. JONES

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| UNITED STATES OF AMERICA, | No. CR10-336RAJ |
|---|---|
| Plaintiff, | |
| v. | DEFENSE SENTENCING MEMORANDUM |
| COLTON HARRIS-MOORE, | |
| Defendant. | |

I.   INTRODUCTION

The defendant, Colton Harris-Moore, is before the court for sentencing pursuant to his Federal Rule of Criminal Procedure 11(c) plea of guilty to the following seven counts: (1) Bank Burglary, in violation of 18 U.S.C. §2113(a); (2) Interstate Transportation of a Stolen Aircraft, in violation of 18 U.S.C. §2312; (3) Interstate and Foreign Transportation of a Stolen Aircraft, in violation of 18 U.S.C. §§922(i) and 924(a)(2); (4) Fugitive in Possession of a Firearm, in violation of 18 U.S.C. §§922(g)(2) and 924(a)(2); (5) Piloting an Aircraft Without a Valid Airman's Certificate, in violation of 49 U.S.C. §46306(b)(7); (6) Interstate Transportation of Stolen Vessel, in violation of 18 U.S.C. §2312; and (7) Interstate Transportation of a Stolen Aircraft, in violation of 18 U.S.C. §2312. Sentencing is presently scheduled before the Honorable Richard A. Jones for January 27, 2012. The parties have agreed to recommend a sentence that is between 63 and 78 months.

Currently 20 years old, Mr. Harris-Moore has been detained since July 11, 2010. Following his plea in this Court, on December 16, 2011 Mr. Harris-Moore plead guilty to more than thirty State charges arising in Snohomish, San Juan and Island Counties and

DEFENDANT'S SENTENCING MEMORANDUM- 1

LAW OFFICES OF JOHN HENRY BROWNE, P.S.
200 DELMAR BUILDING
108 S. WASHINGTON STREET
SEATTLE, WASHINGTON 98104
(206) 388-0777 • FAX: (206) 388-0780

was sentenced in Island County Superior Court. The Honorable Vicki Churchill sentenced Mr. Harris-Moore to 87 months, the low end of the standard sentencing range.

Due to Mr. Harris-Moore's documented cognitive deficits, acknowledged acceptance of responsibility, ability to pay full restitution, and the circumstances of his offenses, the defense hereby recommends a sentence of 70 months of incarceration as sufficient, but not greater than necessary, to fulfill the purposes of sentencing.

## II. SUMMARY OF FACTS

### A. Family Background

Colton was born to Pam Harris Kohler via caesarean section on March 22, 1991. At birth, Colton was only at the fifth percentile for weight and tenth percentile for height. When Colton was three months old, he was hospitalized for surgical repair of right-sided inguinal and umbilical hernias. At 21 months, pediatric records reflect that there were questions about "behavior problems and developmental delay." See Ex. A, Mitigation Package by Pamela Rogers.

Colton was exposed to alcohol prenatally. Family members report that Pam was drinking alcohol "at least once a week" throughout the pregnancy. Pam's brother, Ed Kohler, went to the bars with Pam once a week during her pregnancy and said, "the pregnancy didn't affect her drinking whatsoever." During these times, she would "drink until she couldn't hardly walk." Pam was also smoking cigarettes throughout the pregnancy.

By all accounts, Pam was a violent alcoholic throughout Colton's entire childhood. Many family members report that Pam would take her anger out on Colton and often tell him "I wish you had been born dead." Colton writes: "I have known my mom to drink my entire life… I will say that she will always be in denial and will probably always drink." See Ex. A, Mitigation Package by Pamela Rogers, pg. 15. Since his current incarceration, Colton has not accepted visits from his mother.

Colton's biological father is Gordon Moore. Colton, however, never had a father-son connection with Gordon and never referred to him as "dad." Colton remembers Gordon as a "violent drunk" who frequently beat him. Colton last saw his father when Colton was 13 years old. The last thing Colton remembers his father saying is "I will be

DEFENDANT'S SENTENCING MEMORANDUM- 2

LAW OFFICES OF JOHN HENRY BROWNE, P.S.
200 DELMAR BUILDING
108 S. WASHINGTON STREET
SEATTLE, WASHINGTON  98104
(206) 388-0777 • FAX: (206) 388-0780

back when you turn 16 years old so I can kick your ass without going to jail." See Ex. A, Mitigation Package by Pamela Rogers, pg. 8.

When Colton was four years old, his mother married Bill Kohler. Bill became a father figure to Colton, despite a heroine problem and history of violence. Bill died while visiting friends in Oklahoma when Colton was ten years old. The death hit Colton hard. Pam coped with a long alcohol binge.

### B. Educational History

When Colton was three years old, he was identified as developmentally delayed and placed into Special Education Services designed to focus on three areas: (1) behavior/social issues, (2) cognitive development, and (3) speech and language issues. The school did not conduct IQ testing or additional evaluation. In March 1997, three years after this initial assessment, it was decided that Colton no longer qualified for Special Education Services. He began kindergarten in a regular classroom without special education help. It does not appear that any additional testing was conducted before Colton was abruptly mainstreamed.

As a student, Colton was distracted and had problems following directions, keeping his hands to himself, and showing self-control. Teachers also noted, however, his strengths and one entry from a report card states: "Colt is so polite and kind-hearted. He has a great attitude." Colton does not have any memory of his mother helping him with homework or asking about his day in school. In first grade, Colton enrolled in soccer and cub scouts but was forced to quit when his mother did not have the money for gas to take him to practices and meetings. In second grade, the class was given five homework projects for the year; Colton turned in zero.

Although Colton wanted to do well in school, he did not have the support or resources to do so. Pam never encouraged Colt to do well in school. Instead, she told Colton that he would never graduate from high school. Throughout his childhood, Colton missed school frequently because his mother did not care whether Colton attended.

### C. Childhood History

Colton was raised in a two-bedroom, single wide trailer on five fairly secluded acres on Camano Island. For most of Colton's life, he was living in poverty and without

DEFENDANT'S SENTENCING MEMORANDUM- 3

LAW OFFICES OF JOHN HENRY BROWNE, P.S.
200 DELMAR BUILDING
108 S. WASHINGTON STREET
SEATTLE, WASHINGTON  98104
(206) 388-0777 • FAX: (206) 388-0780

food. Colton vividly recalls that there was literately no food in the house for most of the month, every month. He began breaking into neighbors' homes during late elementary school to raid refrigerators. Colton describes these actions: "I broke into a house for no other reason but to steal food. I was truly desperate and just that hungry. I only took small food items to avoid suspicion of a break in so that I could come back the next time I was hungry." <u>See</u> Ex. A, Mitigation Package by Pamela Rogers, pg. 21.

Child Protection Services first became involved in Colton's life when he was just four years old, due to a report of physical abuse by his mother. Neighbors called Child Protective Services numerous times to report yelling and screaming between Gordon and Pam. Another report was filed when Colton was ten years old, after Colton was physically abuse by his mother's boyfriend. After each referral, a social worker would speak to Pam and encourage her to seek help for her alcoholism and anger issues. Child Protective Services, however, continually dismissed the referrals and closed the file when Pam would not get help. There was one attempt to remove Colton from Pam but it was short-lived and the follow-up was non-existent. It appears that all concerned were aware that Pam neglected her son, failed to feed him, and was physically and emotionally abusive. When Pam refused help, Colton was left with her over and over again. As a direct consequence of this, Colton became distrustful of authority figures and did not believe anyone in the system would ever help him. By the time Colton was 15 years old, there were approximately 12 Child Protection Services referrals regarding his welfare. <u>See</u> Ex. C, Dr. Richard Adler, Psychiatric Evaluation (2011). Throughout years of abuse, Colton was never afforded the attention from authorities that he desperately needed.

Colton became depressed early in life. When he was ten years old, he was evaluated at Compass Health and was diagnosed with ADHD, depression, intermittent explosive disorder, and parent-child relational problem. When Colton was 16, he was evaluated by Dr. Young who noted that when Colton was around 12 years old: "Colton endorsed many symptoms of depression … such as an inability to sleep for the past three years." Records reflect that Colton was placed on an antidepressant during this time, however, his mother did not follow through with providing Colton's medication and he soon stopped taking it. At 16 years old, Colton explained that at home he feels

DEFENDANT'S SENTENCING
MEMORANDUM- 4

LAW OFFICES OF JOHN HENRY BROWNE, P.S.
200 DELMAR BUILDING
108 S. WASHINGTON STREET
SEATTLE, WASHINGTON  98104
(206) 388-0777 • FAX: (206) 388-0780

"depressed feelings" which Dr. Young characterized as "dysphoria, lethargy, lack of motivation, and hopelessness." See Ex. B, Dr. Delton Young, Forensic Psychological Evaluation (2007).

At the request of Colton's 2007 defense counsel, Dr. Young conducted an assessment of Colton. Dr. Young concluded that Colton's intellectual capacities are in the average range. The clinical profile from Dr. Young's testing suggests "an adolescent with depressive, fearful, and socially anxious attributes." Further, due to the victimization and abuse by his parents, Colton is likely to show quick and impulsive reactions with inadequate thought given to the consequences of his behaviors. Dr. Young concluded that "Colton is an intellectually capable adolescent boy who surely would be able to succeed in academic and occupational endeavors in the years ahead given emotional stability." See Ex. B, Dr. Delton Young, Forensic Psychological Evaluation (2007).

### D. Interaction with the Juvenile Justice System

Colton's formative experiences interacting with law enforcement shaped his current distrust of police officers and prosecutors. When Colton was just old enough to reach the pedals, he received a brand new bike for his birthday and was proudly riding it through the gravel roads near his home. Police officers stopped him and accused Colton of stealing the bike. As Colton's Aunt reflects, "what do you think that does to a child's mind?" See Ex. J, Support Letter from Sandra Puttmann. This interaction started a Colton's pattern of behavior of distrusting authority figures, especially law enforcement.

When Colton was 12 years old, he experienced his first interaction with the juvenile justice system. He joined a group of friends in breaking into an abandoned cabin that was located down the street from where Colton lived. The kids broke into the home to make pancakes in the kitchen. When an unrelated brushfire started near the property sometime later, police questioned the children in the area including Colton. One police officer spontaneously asked Colton if he knew anything about breaking into the cabin. Colton immediately started crying and admitted to participating in the pancake mess. There was no arrest and he was released.

Colton's next interaction with police was when he was in fifth grade and 13 years old. Colton broke into his elementary school to steal candy and was stopped by a police

DEFENDANT'S SENTENCING MEMORANDUM- 5

LAW OFFICES OF JOHN HENRY BROWNE, P.S.
200 DELMAR BUILDING
108 S. WASHINGTON STREET
SEATTLE, WASHINGTON 98104
(206) 388-0777 • FAX: (206) 388-0780

officer as he was walking out. The police officer, again, did not arrest Colton. Instead, he lectured Colton about stealing and dropped him off at home.

Around this time, Colton began breaking into houses to steal food. He would usually scout out which homes were used as "summer houses" to avoid running into people. He would often walk straight to the refrigerator, load his arms full of food, and leave quietly. Due to the abuse and stress that Colton was experiencing in his home during this time, he finally ran away from his mother's trailer around August of 2006. During this time, he continued to break into homes and steal food, laptops, and cell phones.

In February of 2007, after six months on the run, police found Colton and arrested him. He was sentenced to serve three years of juvenile detention through the Washington State Juvenile Rehabilitation Administration. Colton spent about six months at Green Hill Detention Center. He did everything he could to be transferred to a residential center.

After demonstrating good behavior at Green Hill, Colton was transferred to Griffin Home, an unlocked residential treatment center for youth. Colton thought that this move would allow him to enroll in a real school and begin learning about aviation. Instead, Colton experienced an environment where his counselor urged him to change his career goals saying "you will never be a pilot." Colton stayed in Griffin Home for a few months but finally felt the living situation was "unbearable." On April 22, 2008, Colton asked to be sent back to Green Hill. When the counselors refused, Colton snuck out a window and ran away that same night. He spent the next two years running from police and committing various property crimes.

**E. Life On the Run** (April 29, 2008 - July 13, 2010)

Upon leaving Griffin Home Residential Center, Colton started a life "on the run" as he broke into homes and took cars, airplanes, and boats to help escape police. Colton explains that throughout this entire period, he did not have a "plan." He had no idea where he was going and did not know what he would do next. Throughout these years, the media attention continued to grow. Colton describes this time: "I felt hunted, like an animal. There were helicopters over my head constantly, searching for me. To say I was on edge would put it lightly. I went so far as to arm myself…to protect myself if I was

DEFENDANT'S SENTENCING MEMORANDUM- 6

LAW OFFICES OF JOHN HENRY BROWNE, P.S.
200 DELMAR BUILDING
108 S. WASHINGTON STREET
SEATTLE, WASHINGTON  98104
(206) 388-0777 • FAX: (206) 388-0780

ever shot at." When Colton would call his mother, she would warn him that "the cops and bounty hunters are going to kill you." <u>See</u> Ex. A, Mitigation Package by Pamela Rogers, pg. 16. Colton sincerely believed her and feared for his life.

The following are the facts associated with the current federal offenses:

**Count 1 – Bank Burglary**: On September 5, 2009, Colton used tools to break into Islanders Bank in Eastsound, WA. He attempted to steal money from an ATM machine but was unsuccessful. He caused approximately $1,000.00 of damage to the bank.

**Count 2 – Interstate Transportation of a Stolen Aircraft**: On September 29, 2009, Colton stole a 2005 Cessna aircraft from Bonner's Ferry, Idaho and flew the plane to a clearing near Granite Falls, Washington.

**Count 3 – Interstate Transportation of a Stolen Firearm**: On September 27, 2009, Colton broke into a hanger in Creston, British Columbia and stole several items including: a Dell laptop computer, a .32 caliber handgun, $200 in cash, food, a sleeping bag, and an axe. He carried this gun with him for the next few months.

**Count 4 – Fugitive in Possession of a Firearm**: Between September 29, 2009 and May 2, 2010, Colton carried a firearm as he continued to avoid police. Colton never physically threatened or harmed any person with this firearm.

**Count 5 – Piloting an Aircraft Without a Valid Airman's Certificate**: During Colton's life on the run, he stole airplanes without a valid airman's certificate and without filing a flight plan or making safety-related communications with air traffic control. Although no person was ever physically harmed during these flights, there was property damage.

**Count 6 – Interstate Transportation of a Stolen Vessel**: On May 31, 2010, Colton took a 34-foot yacht from a marina in Ilwaco, Washington and sailed to Warrenton, Oregon. The boat was not damaged.

**Count 7 – Interstate Transportation of a Stolen Aircraft**: On July 4, 2010, Colton stole a Cessna Corvalis from an Indiana airport and flew to Abaco Island, Bahamas where he crashed in a mangrove swamp.

On July 11, 2010, Colton was arrested at Harbour Island, Bahamas. Since then, Colton has been held at the Federal Detention Center in Seatac, Washington.

DEFENDANT'S SENTENCING
MEMORANDUM- 7

LAW OFFICES OF JOHN HENRY BROWNE, P.S.
200 DELMAR BUILDING
108 S. WASHINGTON STREET
SEATTLE, WASHINGTON 98104
(206) 388-0777 • FAX: (206) 388-0780

### F. Acceptance of Responsibility

Since his arrest and detention, Colton has continued to shy away from the media frenzy that surrounds his story. He is genuinely and sincerely remorseful about the impact that his actions had on so many people. Specifically, when Colton reviewed victim impact statements, he became especially troubled upon learning that he caused people to be fearful in their homes. Colton never intended that and did not understand that his actions caused significant property loss and a sense of displacement and violation for many of the victims. Colton explains: "I wish things had happened very differently and that there wasn't so much pain in all of this." Colton now views his actions as immature and prior to his understanding of the life-long ramifications. See Ex. E, Letter of Responsibility from Colton Harris-Moore.

Although Colton was able to successfully fly small airplanes without major harm to himself, he is now aware of the risks he took and how those actions could have significantly endangered others. Colton writes about his first experience flying a plane from Orcas Island, Washington to an area near Yakima, Washington: "being completely untrained for instrument flight, I survived only by shear concentration and determination, while trying to recall everything I've ever read about instrument flying. However, I was in a situation you could never prepare yourself for by reading about." See Ex. E, Letter of Responsibility from Colton Harris-Moore. Colton believes that he is lucky to be alive and now understands that he risked other people's safety when he flew those planes.

In Colton's mind, he did not comprehend how his actions could harm others. As Colton had never physically harmed any of his victims, he saw the property damage and theft as minor acts that did not hurt anyone. It was only after reading victim impact statements that Colton became aware that his actions caused people to fear him. For the two years that he committed crimes, Colton did not appreciate the wrongfulness of his actions.

While in federal custody, Colton was approached by a nationally-known movie production company, 20th Century Fox. Colton decided to allow the media to dive into his painful and embarrassing past only so that he could repay his victims and provide restitution. He has no desire to profit personally. Colton shows empathy and emotion for his victims and desires to "make things right."

DEFENDANT'S SENTENCING MEMORANDUM- 8

LAW OFFICES OF JOHN HENRY BROWNE, P.S.
200 DELMAR BUILDING
108 S. WASHINGTON STREET
SEATTLE, WASHINGTON  98104
(206) 388-0777 • FAX: (206) 388-0780

For the past two years, Colton has matured in a stable environment away from his chaotic family. In this environment, he has been able to ruminate about his childhood and upbringing. He has also been able to develop goals and aspirations for how he will positively contribute to society when he is released. Colton intends to pursue a career in aviation, specifically in aeronautical engineering. He plans to get his GED while incarcerated and focus on bettering his life.

### G. Family and Community Support

For those that know Colton best, there is a unified hope for Colton's future. Colton finally has the support network he needs to be successful. Shauna Snyder, a defense investigator from Island County states: "Colton learned honesty from a liar, kindness from the unkind. He's a very good kid who started running away to get away from Mom." Shauna believes that if Colton was released today, he would never be in trouble again. See Ex. A, Mitigation Package by Pamela Rogers. Colton's ★Aunt states: "Colton isn't a criminal type. Locking him up with real, hard-core criminals for a long time is only going to ruin him." Many who know Colton believe that the notoriety that his case has generated has turned Colton's painful childhood into other's entertainment.

Those who know Colton characterize him as a gifted individual who was victimized by a deficit of resources and inability to exercise his intellectual capabilities in a positive manner. Many of these people have written letters of support and share times when Colton expressed remorse for his actions and admitted that he made grave mistakes. Colton displays a sense of empathy and understanding; many friends have seen Colton mature and develop positive self-awareness. This support group is united in their hope for Colton's future. See Exs. F-K, Community Support Letters.

### H. Dr. Richard Adler, Psychiatric Evaluation

Dr. Richard S. Adler, M.D. has evaluated Colton Harris-Moore with an eye toward what Colton has done and his current potential for rehabilitation. This psychiatric evaluation represents the most thorough and comprehensive evaluation of Colton ever conducted. Dr. Adler found that: (1) Colton does not have Antisocial Personality Disorder; (2) Colton does not have a superior intelligence quotient (IQ); (3) Colton has significant life-long neurocognitive impairments which were never comprehensively assessed; (4) these neurocognitive impairments put Colton at risk for his pattern of

DEFENDANT'S SENTENCING
MEMORANDUM- 9

LAW OFFICES OF JOHN HENRY BROWNE, P.S.
200 DELMAR BUILDING
108 S. WASHINGTON STREET
SEATTLE, WASHINGTON  98104
(206) 388-0777 • FAX: (206) 388-0780

criminal behavior; (5) Colton's circumstances can be described as reflecting "an acute identity crisis of young adult life;" (6) Colton's deficits can be effectively remediated and (7) with appropriate interventions, Colton has a favorable prognosis with a low risk of recidivism. See Ex. C, Dr. Richard Adler, Psychiatric Evaluation (2011).

Dr. Adler performed several neuropsychological screening tests in May 2011. The results from these tests were compared to results generated by Dr. Delton Young in May 2007. Dr. Adler also consulted Neuropsychologist Craig Beaver who performed additional testing. Dr. Beaver found that Colton had the following problems: verbal fluency (problems organizing and verbally expressing his thoughts in a quick and concise manner), mathematics learning disorder, attention and concentration problems (including initial impulsive responding), and problems with initial processing of new information. Dr. Beaver commented that it was "remarkable that a more comprehensive neurophysiological examination was not completed early on." The pattern of Colton's behavioral difficulties, early special education and speech problems should have been a "warning sign" prompting further study.

Given the likelihood that Colton was exposed to alcohol prenatally, Dr. Adler sought consultation on the possibility of Fetal Alcohol Spectrum Disorder. Dr. Paul D. Connor, Ph.D, concluded that Colton's pattern of functioning is consistent with Fetal Alcohol Spectrum Disorder due to the following: (1) deficits in academic functioning especially in arithmetic, (2) significant deficits in impulsivity and variability of attention functioning, (3) deficits in memory functioning, and (4) deficits within the domain of executive functioning and control. See Ex. C, Attachment to Dr. Richard Adler, Psychiatric Expert Report (2011). Colton's life course of neurobehavioral problems is consistent with the trajectory of persons adversely affected by prenatal exposure to alcohol.

Dr. Alder also administered the Minnesota Multiphasic Personality Inventory (MMPI-2). Internationally-known MMPI expert, Alex Caldwell, concluded that there was genuine emotional disturbance and an "acute identity crisis of young adult life." Colton tested as a person who was acting out with poor impulse controls and defective judgment. Colton has an estimated intelligence quotient (IQ) of 108-113. See Ex. D, Letter from Dr. Craig W. Beaver, Colton's Estimated IQ Score.

DEFENDANT'S SENTENCING
MEMORANDUM- 10

LAW OFFICES OF JOHN HENRY BROWNE, P.S.
200 DELMAR BUILDING
108 S. WASHINGTON STREET
SEATTLE, WASHINGTON  98104
(206) 388-0777 • FAX: (206) 388-0780

**IV.   OBJECTIONS TO THE PRESENTENCE REPORT**

The defense will file a supplemental motion to respond to the probation presentence report.

**V.   DEFENSE SENTENCING RECOMMENDATION**

Given the evidence of Colton Harris-Moore's cognitive deficits, acceptance of responsibility, support from family and friends, and amenability to treatment, the defense hereby recommends a sentence of 70 months of incarceration. We ask the Court to follow the joint recommendation of the parties and order that Mr. Harris-Moore's sentence be served concurrently to the sentence of 87 months imposed by the State of Washington. Additionally, we ask the Court to designate a state facility to serve Mr. Harris-Moore's sentence.

The defense, with the cooperation of the government, identified all affected jurisdictions and consolidated the charges to ensure that all victims will be compensated with restitution. Mr. Harris-Moore was a driving force in identifying these jurisdictions. In assisting with this process, Mr. Harris-Moore demonstrated that he accepted responsibility for his actions. The defense and government agreed that a range of 63-78 months is appropriate in federal sentencing. Further, the defense and government understood that Mr. Harris-Moore would be entering a plea for his state charges prior to his federal sentencing. In doing so, we anticipated that Mr. Harris-Moore's state charges would not affect his federal sentencing range.

Mr. Harris-Moore has agreed to provide restitution to all of his victims, in the amount of $1,409,438.00. Mr. Harris-Moore was provided an unique opportunity to provide this restitution when 20th Century Fox approached him. Although Mr. Harris-Moore signed a contract for over a million dollars, he only did so to repay his victims through restitution. Mr. Harris-Moore will not profit from the movie contract in any way. In fact, Mr. Harris-Moore was the one who suggested that he would only sign a movie contract if the money was used for restitution.

We ask the Court to examine Dr. Richard Adler's report and accompanying testimony when determining an appropriate sentence for Mr. Harris-Moore. Mr. Harris-Moore's capacity to appreciate the wrongfulness of his conduct was significantly impaired due to his documented neurocognitive deficits. Through consultation with

DEFENDANT'S SENTENCING
MEMORANDUM- 11

LAW OFFICES OF JOHN HENRY BROWNE, P.S.
200 DELMAR BUILDING
108 S. WASHINGTON STREET
SEATTLE, WASHINGTON  98104
(206) 388-0777 • FAX: (206) 388-0780

numerous experts, there is a firm consensus that Mr. Harris-Moore has severe cognitive defects due to Fetal Alcohol Spectrum Disorder and a childhood history of abuse and neglect. These deficits were never adequately addressed and subsequently put Mr. Harris-Moore at risk for criminal behavior.

Specifically, Mr. Harris-Moore's poor impulse control and defective judgment is seen throughout his life on the run, especially when reviewing the number of times that he flew airplanes without having any experience or training. These risk taking behaviors were multiplied by his mother's statements and the media frenzy that surrounded his actions. Mr. Harris-Moore's criminal acts began when he ran away from Griffin Home and started to snowball out of control when his mother told him: "you will probably be killed if you get caught." His conduct continued to grow more desperate and irrational as he made frantic decisions without much thought or planning. This behavior, while not excusable, can be explained by Dr. Adler's report and findings.

Additionally, it is appropriate for Colton's sentence to reflect the magnitude of mitigating circumstances present in his life. Colton endured a painful childhood filled with abuse and neglect. He began stealing out of necessity and never fully understood how his thefts could cause harm to his victims until recently. Although Colton did carry a gun with him at times during his life on the run, he never used it. Colton is a non-violent offender and has not physically harmed anyone. Last, Colton has shown tremendous maturity in the last 18 months at the Federal Detention Center. He is finally being comprehensively evaluated and treated for his cognitive defects and receiving the support that he has yearned for throughout his painful life.

Dr. Adler believes that, although Colton has exhibited risk seeking behaviors, he has a low risk of recidivism for the future. Colton has a relatively narrow pattern of criminal behavior which revolves around stealing and fleeing. With early identification and effective treatment of the psychiatric issues identified, Dr. Alder estimates that Colton will never return to the criminal justice system. As Colton is only 20 years old, this Court has the power to punish Colton for his actions but also offer him hope and rehabilitation so that he may become a contributing member of society.

Given this set of circumstances, a sentence of 70 months of incarceration will accomplish the stated purposes of sentencing, reflects the seriousness of the offense, and

DEFENDANT'S SENTENCING MEMORANDUM- 12

LAW OFFICES OF JOHN HENRY BROWNE, P.S.
200 DELMAR BUILDING
108 S. WASHINGTON STREET
SEATTLE, WASHINGTON  98104
(206) 388-0777 • FAX: (206) 388-0780

"afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a). This will allow Colton to be held accountable for his actions and give victims a sense of justice, but will also allow Colton to successfully reintegrate back into society with a majority of his life left.

## VI. CONCLUSION

For the foregoing reasons, a sentence consisting of 70 months of incarceration is appropriate in this case to adequately punish Mr. Harris-Moore's criminal conduct.

DATED this 24th day of January, 2012.

        Respectfully submitted,

        LAW OFFICES OF JOHN HENRY BROWNE, P.S.

        s/ Emma C. Scanlan
        JOHN HENRY BROWNE, WSBA #4677
        EMMA C. SCANLAN, WSBA #37835
        EMILY GAUSE, WSBA #44446
        Attorneys for Colton Harris-Moore
        108 S. Washington Street, Suite 200
        Seattle, Washington 98104
        206-388-0777  fax: 206-388-0780
        e-mail: escanlan@jhblawyer.com

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 24th day of January, 2012, I electronically filed the foregoing with the clerk of the court using the CM/ECF system, which will send notification of such filing to the attorneys of record for the parties. I hereby certify that I have served any other parties of record that are non CM/ECF participants via Telefax/US postal mail.

Dated this 24th day of January, 2012.

        s/ Lorie Hutt
        Lorie Hutt, Administrative Assistant
        JOHN HENRY BROWNE, #4677
        Counsel for the Defense
        108 S. Washington Street, Suite 200
        Seattle, Washington 98104
        Phone: 206-388-0777
        Fax: 206-388-0780
        Email: lorie@jhblawyer.com

DEFENDANT'S SENTENCING MEMORANDUM- 13

LAW OFFICES OF JOHN HENRY BROWNE, P.S.
200 DELMAR BUILDING
108 S. WASHINGTON STREET
SEATTLE, WASHINGTON  98104
(206) 388-0777 • FAX: (206) 388-0780