The Hon. Richard A. Jones

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR10-336-RAJ |
| Plaintiff, | ) | |
| v. | ) | GOVERNMENT'S SENTENCING MEMORANDUM |
| COLTON HARRIS-MOORE, | ) | |
| Defendant. | ) | |

## I.    INTRODUCTION

The United States of America, by and through Jenny A. Durkan, United States Attorney for the Western District of Washington, and Darwin P. Roberts and Michael Dion, Assistant United States Attorneys for said District, hereby submits this Sentencing Memorandum in the above-captioned matter.  Sentencing is scheduled for Friday, January 27, 2012, at 9:00 a.m.  For the reasons described below, the United States agrees with all of U.S. Probation's sentencing recommendations, including a 78 month term of imprisonment.  That term falls in the middle of the Guidelines range calculated by U.S. Probation, and near the low end of the Guidelines range calculated by the United States.

Facing very strong evidence against him, Colton Harris-Moore has pled guilty to seven federal crimes he committed in 2009 and 2010.  They include a bank burglary; the

interstate transportation of two stolen aircraft and one stolen vessel; piloting another (stolen) aircraft without a license; and two firearms offenses involving stolen handguns. In his Plea Agreement (Dkt #50), Mr. Harris-Moore also acknowledged, as relevant conduct, at least twenty-seven other crimes that he committed outside the State of Washington.  Most prominently, in May, June, and July, 2010, he committed a string of offenses as he traveled through Oregon, Idaho, Wyoming, South Dakota, Nebraska, and Iowa, including nine auto thefts and eight burglaries.  Among these were a residential burglary in South Dakota.  During that burglary, Mr. Harris-Moore was discovered by the homeowner, and threatened to shoot the homeowner in order to make his escape.

On December 16, 2011, Mr. Harris-Moore appeared in the Superior Court of Washington for Island County, where he pled guilty to 33 additional felony charges committed between 2008 and 2010 in Island, San Juan, and Snohomish Counties.  This means that a combined total of at least 67 crimes by Mr. Harris-Moore are being recognized in the state and federal proceedings.  Mr. Harris-Moore committed all of these crimes in a single 27-month span, during which he was a fugitive from a Washington juvenile sentence. The combined total of restitution owed by Mr. Harris-Moore, for the damages he caused, will be not less than $1,271,236.60.

As he appears for sentencing by this Court, Mr. Harris-Moore has written a letter acknowledging his crimes and apologizing to his victims.  He has agreed to forfeit the intellectual property rights to the story of his crimes, for the purpose of funding restitution to victims.  He has presented mitigation materials that discuss his unquestionably difficult childhood.  He has obtained a report from a medical expert concluding that he has been affected by fetal alcohol syndrome, and that he suffers from post-traumatic stress disorder caused by his near-fatal first airplane theft in 2008.

The United States submits that despite Mr. Harris-Moore's guilty pleas, his letter accepting responsibility, and his arguments for mitigation, Mr. Harris-Moore should receive the full 78-month sentence recommended by the United States and U.S. Probation.  There are several reasons for this.  They include the prolonged and deliberate

GOVERNMENT'S SENTENCING MEMORANDUM/HARRIS-MOORE
Case No. CR10-336-RAJ - 2

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

nature of his crimes, which were committed solely for his own amusement and profit; his repeated willingness to use violence and the threat of violence, with stolen guns, to avoid capture; serious questions, as revealed by his private statements, concerning the sincerity of his acceptance of responsibility; and the overall reasonableness of the recommended sentence, given the very high number of crimes acknowledged through this case.

First, the evidence proves that Mr. Harris-Moore's criminal odyssey was carefully planned and entirely intentional.  Mr. Harris-Moore attempts to whitewash his actions as all part of his childhood dream of flying, but his aircraft thefts were merely the showiest parts of his crime spree.  Mr. Harris-Moore took deliberate, focused action to enrich and entertain himself at others' expense, while evading capture for as long as possible.  There is evidence suggesting Harris-Moore had long planned to steal as much money as he could while permanently escaping to the Caribbean in a stolen aircraft.  To this end, he tried to build up a cash hoard by repeatedly burglarizing businesses and attacking their safes and ATMs.  Meanwhile, he used stolen computers to hone his flying skills, research his future crimes, check up on the police trying to catch him, check his following on the Internet, and (likely) communicate with supporters.

Second, Mr. Harris-Moore used force or the threat of force to evade capture on multiple occasions.  These included his threat to shoot the homeowner who discovered him in South Dakota; firing a shot to stop sheriff's deputies chasing him near Granite Falls; and pepper spraying a deputy to avoid capture on Orcas Island.  Mr. Harris-Moore also stole at least three semiautomatic handguns and a police assault rifle during his time on the run.  This helped him evade law enforcement by making officers warier of him, and caused additional fear for his victims and their neighbors.  All of this created many dangerous situations in which Mr. Harris-Moore, or someone else, could have been hurt or killed.

Third, there are good reasons to question whether Mr. Harris-Moore's public expressions of remorse and acceptance of responsibility are entirely genuine.  Many of his private statements take a tone that is quite different from his Letter to the Court.  For

GOVERNMENT'S SENTENCING MEMORANDUM/HARRIS-MOORE
Case No. CR10-336-RAJ - 3

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

example, after his Superior Court sentencing on December 16, he declared that the state's case against him was "high propaganda" and "weak argument"; called his sentencing "political," meant to "appease" the "citizens and sheriffs"; and called the prosecution and police "swine," "fools" and "asses." He called the Superior Court's pronouncement of a low-end sentence "a much appreciated recognition and validation." His Letter to the Court asserts that he does not want to "glamorize" anything he has done, but in private, he described his flights as "amazing" and compared himself to "the Wright brothers."

Fourth, and finally, the recommended 78-month sentence is entirely fair in light of the facts and circumstances of the case. The Plea Agreement takes Mr. Harris-Moore's mitigating circumstances into account by allowing him to consolidate dozens of his crimes into this sentencing. A 78-month sentence is within the middle of the range calculated by U.S. Probation just for the offenses charged in the Superseding Information, not including the other offenses listed here as relevant conduct. It is near the low end of the range calculated by the United States. Mr. Harris-Moore already obtained similar benefits from consolidating dozens of additional crimes in Superior Court. He should not receive any further "breaks."

Mr. Harris-Moore's troubled childhood does not excuse the fact that he committed scores of felonies out of pure self-interest and greed. During his time "on the run," he fully understood that his crimes were wrong, but he still chose to inflict them on others. The United States endorses U.S. Probation's recommendation of a 78 month sentence of imprisonment, in the middle of U.S. Probation's calculated Guidelines range. The United States also agrees with U.S. Probation that the federal sentence should be imposed consecutive to the undischarged state sentence that Mr. Harris-Moore previously escaped from, so that his flight to the Bahamas will not be rewarded with a discount on his total term of imprisonment. The United States further endorses the maximum three year term of supervised release, with all the special conditions recommended by U.S. Probation. Finally, the United States requests that the Court enter the Preliminary Order of Forfeiture, and impose the government's proposed Order of Restitution.

GOVERNMENT'S SENTENCING MEMORANDUM/HARRIS-MOORE
Case No. CR10-336-RAJ - 4

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

II.     **FACTUAL BACKGROUND**

The essential facts of this case are accurately outlined in the Presentence Report ("PSR").  In order to fully illustrate the scope of Mr. Harris-Moore's relevant criminal conduct, the United States submits the following statement of facts.[1]

A.      **Mr. Harris-Moore's Account of his Crimes**

Mr. Harris-Moore has submitted a Letter to the Court (undated, but filed in state court approximately December 13, 2011).  His narrative explaining how and why he committed his crimes focuses almost exclusively on what he calls the "personal journey that would pit me face to face with my own mortality," namely, his preparation to steal his first airplane, on November 11, 2008.  Letter to the Court, at 2.   After escaping from juvenile custody on April 29, 2008, Mr. Harris-Moore states that he spent the summer living at a "mountain campsite" on Orcas Island.  There, he says, he bicycled daily to Eastsound to observe airport operations, while training himself how to fly light aircraft, using videos and stolen manuals.  *Id*.  Mr. Harris-Moore omits that during this period, he burglarized a number of Orcas Island residences and businesses.  These included his theft of $10,000 from a restaurant safe in Eastsound around August 27, 2008, and his September 25 pepper spraying of a sheriff's deputy who was trying to apprehend him while he burglarized a house near his campsite.

Mr. Harris-Moore describes at length how, on November 11, he "discover[ed] both passion and . . . a dream" by stealing his first aircraft, flying it through bad weather and going into an uncontrolled spin, before recovering through "second-nature skill" and "ma[king] it out of a situation all odds said I shouldn't have."  Letter to the Court, at 2-3.  His narrative ends with him still airborne, leaving out that shortly afterwards, he crashed and ruined the $182,000 airplane (*see* photographs, below).  He concludes that:

---

[1]  Unless specifically noted otherwise, all the facts described below are based on the Plea Agreement, the Presentence Report, Mr. Harris-Moore's Dec. 16 pleas in Island, San Juan, and Snohomish Counties, and the evidence provided to Mr. Harris-Moore in discovery.  In the event that Mr. Harris-Moore contests any of the facts described in this Memorandum, the United States will supplement the record with appropriate evidence.

> The morning of November 11, 2008 changed my life forever . . . opened my mind and gave me insight into not only myself, but the world; valuable life lessons that I believe I couldn't have learned any other way.

Letter to the Court, at 3.

 

**Yakama Reservation, November 12, 2008**

Mr. Harris-Moore's letter offers no specific explanation for any of the dozens of felonies he committed after his 2008 flight. Essentially, he claims that his actions were "immature" and he did not understand "their life-long ramifications." He states that he did not believe at the time that he was truly frightening his victims, and declares:

> Your Honor, I don't know where I could have broken the cycle. Each step of the way, I felt that I was more and more entrenched with a path, and the situation had taken a life of its own. Tainted mistakes of my past, which snowballed into new crimes to sustain my present, and while I tried to distract myself with the dreams of the future, I am before you know paying for all these mistakes.

Letter to the Court, at 1, 3. In evaluating whether Mr. Harris-Moore genuinely felt himself haplessly "entrenched with a path" in a "situation" that "had taken [on] a life of its own," it is useful to review the evidence of what he actually did during this time.

**B.    Mr. Harris-Moore's Crimes in 2009**

Mr. Harris-Moore disappeared for some time after the November 2008 plane theft, and seems to have spent time living in Reno. Presentence Report, ¶ 14; Harris-Moore email to P.R., August 17, 2011. He returned to Washington by June, 2009, when he stole an AR-15 type rifle from a deputy's patrol car on Camano Island. In August 2009, he traveled to Orcas Island in a boat he stole from La Conner. Presentence Report, ¶ 14.

GOVERNMENT'S SENTENCING MEMORANDUM/HARRIS-MOORE
Case No. CR10-336-RAJ - 6

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

Beginning in September, Mr. Harris-Moore committed a number of nighttime burglaries at various businesses in the Eastsound area. On September 4, 2009, he broke into the Ace Hardware and stole a selection of tools, including a sledgehammer, crowbar and drill bits. He also broke open the store's safe and stole approximately $2,000.00 in cash that had been stored in black Key Bank bags. Presentence Report, ¶¶ 14-15.

The next evening was the night of Friday the 4th to Saturday the 5th, the beginning of Labor Day weekend. Mr. Harris-Moore took the tools he had stolen from Ace Hardware and broke into Islanders Bank, knocking out a window that (at the time) lacked an alarm (Count 1). Using the Ace tools, and a drill stolen from the Homegrown Market, he attacked the ATM safe and attempted to break it open. He knocked off the combination dial and drilled several holes in the safe. He could not open the safe, but caused over $1000.00 in damage to the bank and the safe. Presentence Report, ¶ 15.

**Eastsound, Orcas Island, September 5, 2009:**
**Burglary at Islanders Bank (Count 1)**

 

Having failed to steal any money from the bank, Mr. Harris-Moore moved on to other targets. On September 8, he broke into the nearby Island Market grocery store, and tried but failed to break open (or cart away) its ATM. On September 9, he stole a $50,000 boat and traveled to San Juan Island, leaving the boat adrift off of Friday Harbor, which caused it $17,000 in damage. On the morning of September 11, 2011, he stole his second aircraft, a Cirrus SR22, from the Friday Harbor airport. This SR22, valued at $700,000, was equipped with a Garmin G-1000 electronic cockpit system, which seems to have been

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

the primary system on which Mr. Harris-Moore trained himself to fly.  He flew the Cirrus back to Eastsound, approximately 12 miles, and caused more than $8,000 in damage to it by running it off the runway and across the grass at high speed.  Presentence Report, ¶ 16.

**Eastsound, Sept. 2009: Island Market burglary with Ace Hardware crowbar (Sept. 8); Cirrus stolen from Friday Harbor, landing gear damaged (Sept. 11)**




On September 12, Mr. Harris-Moore eluded a deputy in a foot chase in Eastsound, yelling "You can't catch me" in the dark.  Around September 13, he stole a boat from Orcas Island, piloted it north to Point Roberts, left the boat adrift, and crossed on foot into Canada.  In Canada, he stole a BMW and drove eastward.  Presentence Report, ¶¶ 16-17.

**Boat stolen from Orcas Island, Sept. 12, recovered drifting off Point Roberts; BMW stolen from Delta, BC, recovered at Creston, BC**




A witness who knew Mr. Harris-Moore reported to the FBI that around this time, he received two telephone calls from Harris-Moore.  This witness's statements, made in late 2009, were consistent with what is now known about Harris-Moore's actions.  The

GOVERNMENT'S SENTENCING MEMORANDUM/HARRIS-MOORE
Case No. CR10-336-RAJ - 8

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  witness, "W," reported that during the first call, in September of 2009, Harris-Moore told

2  "W" that he wanted to arrange a meeting, with "W" and another person, in Canada; that

3  he had recently tried to steal an ATM, but failed; and that he had traveled to Canada by

4  using a stolen boat to get from "the islands" to Point Roberts.

5      In the second call, which "W" believed was a short time after the first, Harris-

6  Moore told "W" that he had stolen an airplane; that he had stolen airplanes before; and

7  that he had learned to fly using a simulator game on a stolen laptop computer.  Harris-

8  Moore also stated that his mother wanted him to turn himself in to police, but that he was

9  "blowing off" this advice, he did not want to go back to jail, was trying to obtain a false

10  identity, and was interested in obtaining firearms.  "W" also reported to the FBI (in 2009)

11  that Harris-Moore had told him he eventually intended to steal a jet and fly to the Cayman

12  Islands, where he wanted to rob an unspecified "rich guy."

13      Around Friday, September 25, 2009, Mr. Harris-Moore arrived in Creston, British

14  Columbia, just north of Idaho.  He abandoned the BMW he had stolen from Delta, BC,

15  and burglarized the Creston Airport.  He moved a Cessna 182 but failed to start it.  From

16  a file cabinet in a hangar, he stole a Dell laptop computer, $200 in cash and a .32 caliber

17  semiautomatic pistol.  Presentence Report, ¶ 18.  Around September 27, Harris-Moore

18  stole a Toyota to travel the short distance to the United States border, which he crossed on

19  foot, carrying the stolen Canadian pistol with him (Count 3).  *Id.*

**Creston Airport, Creston, BC (Stolen pistol, Count 3);
Burglarized hangar, Boundary County Airport, Bonners Ferry, ID (Count 2)**




GOVERNMENT'S SENTENCING MEMORANDUM/HARRIS-MOORE
Case No. CR10-336-RAJ - 9

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1       Just over the border, Mr. Harris-Moore stole another car, drove it south and

2   abandoned it near the Boundary County Airport outside Bonners Ferry, Idaho.  He

3   burglarized hangars at the airport on September 28 and September 29.  On Tuesday the

4   29th, he stole a G-1000 equipped Cessna T182T that belonged to P.G. (Count 2).

5   Presentence Report, ¶ 19.

6   **Flight path of Cessna N2183P, September 29, 2009 (Count 2)**

7

8   

9

10

11

12

13

14

15

16

17

18       Taking off around 6:00 in the morning, Mr. Harris-Moore flew the Cessna south

19   around Spokane and then west.  The flight lasted for about four hours, until he ran out of

20   fuel and crashed the plane in Snohomish County, in a clearcut field east of Granite Falls.

21   Presentence Report, ¶¶ 19-20; *see* photograph, below.

22       Mr. Harris-Moore fled only a few miles from the site of the plane crash.  On the

23   outskirts of Granite Falls, he broke into the house of the G. family, who were not home at

24   the time.  Rifling the house, he stole a comforter, food and clothing, and passports.  He

25   also stole a .22 caliber semiautomatic pistol (Count 4), and carried these items to a

26   makeshift camp in the woods behind the house.  Presentence Report, ¶ 20.

27

28

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

**Granite Falls, October 2009:
Cessna N2183P, crashed (Count 2); burglarized house (Count 4)**

 

On Sunday, October 4, 2009, officers investigating the burglary spotted a light in the woods behind the G. family's house, and went in with a tracking dog to investigate. Officers could hear Mr. Harris-Moore running away when a gunshot was fired from about 30 feet in front of them. The officers fell back to wait for support and Mr. Harris-Moore escaped. The next morning, he stole a GMC Yukon from a house on the west side of Granite Falls and drove to Stanwood, by the highway entrance to Camano Island.

**Granite Falls, October 2009: Cash hoard in Key Bank bags from Ace Hardware,
and Canadian stolen pistol (Count 3), recovered at campsite**

 

In the campsite, police found the .32 pistol that Mr. Harris-Moore stole at the Creston Airport (Count 3). They also found the Key Bank bags that he stole from the Eastsound Ace Hardware in September. Although about $2,000 had been stolen from the Ace

GOVERNMENT'S SENTENCING MEMORANDUM/HARRIS-MOORE
Case No. CR10-336-RAJ - 11

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  Hardware, the bags now contained about $7,000 U.S. and $230 Canadian currency.

2  Presentence Report, ¶¶ 20-22.

3      Around November, 2009, a Facebook page that had been set up to support Mr.

4  Harris-Moore began to attract an increasingly large number of "fans."  Mr. Harris-Moore

5  has stated that while he was on the run, "I would log onto face book every month or so,

6  just to see what was being said," though he also said it was "always the same mix" and

7  "got old." Harris-Moore email to E.A., Dec. 5, 2011.

8      **C.      Mr. Harris-Moore's Crimes in 2010: Orcas Island**

9      Just after midnight on February 10, 2010, Mr. Harris-Moore stole a Cirrus SR22

10  from the airport at Anacortes (Count 5).  He flew northwest, but avoided the restricted

11  airspace around the Vancouver Winter Olympics and landed at Eastsound, about 16 miles

12  away.  As he had in September, Harris-Moore ran the aircraft off the runway at high

13  speed, this time causing almost $29,000 in damage.  Later the same night, he broke into

14  the Homegrown Market in Eastsound, stealing food and $1,200.00 in cash.  He drew

15  numerous bare footprints on the floor of the market, leading out the door, with the slogan

16  "C-YA!" next to the door.  Presentence Report, ¶¶ 22-24.

17
   **Eastsound, Feb. 10, 2010: Cirrus stolen from Anacortes (Count 5), with damaged**
18  **landing gear; footprint and "C-YA!" graffiti at Homegrown Market**

19
20
21    
22
23
24

25      When the Cirrus was searched, police found a yellow notepad page that Mr.

26  Harris-Moore had folded up and evidently dropped as he fled.  The notes included what

27  appeared to be plans for him meet up and travel with persons nicknamed "Chad" and

28  "#3".  There were also aircraft weight calculations, distances between ports, plans to

GOVERNMENT'S SENTENCING MEMORANDUM/HARRIS-MOORE
Case No. CR10-336-RAJ - 12

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

acquire vessels at various ports, and zip codes for checking marine forecasts. Harris-Moore wrote notes including "Enhance after leaving Rosario, if possible leave on a long-range yacht," and warnings such as "Cop possibly lives in marina @ DH" (Deer Harbor) and "Victoria, BC? Delta, BC? Heavy security / Marine patrols until Olympics done!"

During the next few months, Mr. Harris-Moore committed a string of burglaries on Orcas Island. These included another attempt to burglarize the Ace Hardware, and repeated burglaries at the home of the P. family. In early May, 2010, it was discovered that Mr. Harris-Moore had created a hiding space at the Eastsound Airport, in a concealed area near the roof of an aircraft hangar that also belonged to the P. family.

**Eastsound airport "hangar hide," May 2010:**
**Items stolen from P. residence; handgun (Count 4) stolen from Granite Falls**

  

The existence of this "hangar hide" likely played a large role in his ability to commit crimes in Eastsound without being caught. Inside it were the manual for the Anacortes SR22 (Count 5), a note with phone numbers for Mr. Harris-Moore's mother and aunt, and the Jennings .22 pistol stolen from Granite Falls in October 2009 (Count 4). Presentence Report, ¶¶ 22, 25-26.

### D.  Mr. Harris-Moore's Crimes in 2010: Travel East

In May 2010, after the hangar hide was discovered, Mr. Harris-Moore left Orcas Island on the trip that would eventually result in his capture in the Bahamas. As he traveled from Washington to Oregon and east to Indiana, there are no known instances in which Mr. Harris-Moore acquired a vehicle legally. Instead, he followed a pattern of

GOVERNMENT'S SENTENCING MEMORANDUM/HARRIS-MOORE
Case No. CR10-336-RAJ - 13

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   stealing a vehicle, driving it to a location near a small airport, burglarizing the airport
2   while looking for a plane to steal, and (when unsuccessful) stealing another vehicle, often
3   one stored at an airport by a pilot or a rental car company. *See* Presentence Report, ¶ 29.
4   It is likely that he committed so many airport burglaries because he was only capable of
5   stealing a fueled Cessna or Cirrus, with the Garmin G-1000 cockpit system, with the keys
6   stored in or near the aircraft.

7   Using a series of stolen boats, he traveled from Orcas Island to Lopez Island
8   around May 15, to Whidbey Island, and to the Olympic Peninsula on May 28. He stole a
9   Nissan to travel to the Mason County Airport near Shelton, and then stole a Ford Explorer
10  to drive to Ilwaco, Washington, at the mouth of the Columbia River. Around May 31, in
11  Raymond, he left a note at a veterinary clinic with a $100 cash "donation."

12  **Olympic Peninsula, May 31, 2010: note at veterinary clinic in Raymond, WA**



20  In Ilwaco, on May 31, Mr. Harris-Moore stole a 34' boat and piloted it across the river to
21  Warrenton, Oregon (Count 6), to a dock 1.5 miles from the Astoria Regional Airport.
22  *See* Presentence Report, ¶¶ 27-28.

23  Mr. Harris-Moore drove from Oregon east to Idaho. Around June 11, in Star,
24  Idaho, near the Snake River Skydiving Airport, Mr. Harris-Moore stole a 2006 Ford F-
25  150 pickup. It was later recovered almost 350 miles east in Driggs, Idaho, where Mr.
26  Harris-Moore burglarized the Driggs airport and stole a gray Cadillac Escalade from a
27  hangar. That Cadillac was recovered 200 miles east in Cody, Wyoming, abandoned on a
28  street corner less than half a mile from the Yellowstone Regional Airport.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

**Stolen vessel, Warrenton, OR, June 1 (Count 6); Escalade,
stolen from Driggs, ID, around June 12, recovered near airport in Cody, WY**

 

Around June 13, in Buffalo, Johnson County, Wyoming, 180 miles east of Cody, Mr. Harris-Moore stole a red Lincoln pickup from a house, and abandoned it near the Johnson County Airport.  Plea Agreement, ¶ 12; Presentence Report, ¶¶ 30-35.

Around June 13, in Lawrence County, South Dakota, just over the Wyoming border and about 160 miles east of Buffalo, Mr. Harris-Moore burglarized the Spearfish (Black Hills) Airport and stole a 2008 Ford belonging to R.A.  He traveled 200 miles to Pierre, South Dakota, where on June 15 he burglarized the Pierre Regional Airport and stole a silver Ford Edge SUV.  *Id*.

From Pierre, Mr. Harris-Moore drove 250 miles southeast to Yankton, SD.  He broke into the home of the K. family, which is less than a third of a mile away from the Chan Gurney Memorial Airport, across an open field.  On Friday, June 18, the K. family returned home from a vacation in the middle of the night and surprised Harris-Moore, who had been taking a shower.  Mr. K chased Harris-Moore down into the basement. Harris-Moore shined a red light at Mr. K that appeared to be a laser weapon sight, and threatened to shoot Mr. K if he did not get out of the house.  Mr. K and his family retreated, and Harris-Moore apparently escaped through a basement window. Presentence Report, ¶ 37.

While Yankton police searched for him, he stole a Toyota Sequoia, and fled 60 miles south to Norfolk, Nebraska.  In Norfolk, Mr. Harris-Moore burglarized the Karl

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

Stefan Memorial Airport and stole a 2008 Cadillac Escalade.  He drove the Escalade about 260 miles east to Pella, Iowa, just past Des Moines, arriving around June 21.  In Pella, he burglarized the airport and stole cash and a Dodge Caravan.  From Pella, Mr. Harris-Moore followed his pattern almost 500 miles farther east, through Iowa and Illinois, until he arrived at the Monroe County Airport in Bloomington, Indiana, around June 27, 2010.  Presentence Report, ¶¶ 38-43.

It appears that Mr. Harris-Moore spent about a week camped out in a grove of trees within the Monroe County Airport's perimeter fence, monitoring aircraft operations and waiting for a plane to steal.  During this time, he broke into several hangars.  Finally, around July 3, the plane that Mr. Harris-Moore was waiting for arrived: a refueled Cessna Corvalis, equipped with the G-1000 cockpit system, with the key stored in the aircraft for maintenance work.  The Corvalis belonged to J.M. and was worth over $600,000.  On the morning of July 4, 2010, Mr. Harris-Moore broke into J.M.'s hangar to steal the aircraft. He shot a 36-minute video out the cockpit window as he started the engine, worked with the instruments, taxied to the runway, and took off.  Presentence Report, ¶¶ 43-44.

**July 4, 2010 (Count 7): flight path from Bloomington, IN, towards the Bahamas**



During his approximately 5 ½ hour, 1100 mile flight, he also shot a video as he crossed over the coast of South Carolina, and another as he approached islands in the Bahamas.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1

**July 4, 2010 (Count 7): Harris-Moore films Cessna N660BA's cockpit display**
2
**over South Carolina; N660BA crashed on Great Abaco Is., Bahamas**

3

4                      

5

6

7

8

9

10   After crashing the aircraft on Great Abaco Island in the Bahamas, Mr. Harris-Moore

spent another week on the run, during which the FBI offered a $10,000 reward for his
11
capture.  He stole a boat and traveled to a second island, Eleuthera. In the early morning
12
of Sunday July 11th, Mr. Harris-Moore was spotted at a marina on Eleuthera.  He tried to
13
escape in a stolen boat, but police pursued him, and Mr. Harris-Moore ran aground.
14
Police shot out the motors of his boat with an Uzi and a shotgun.  Mr. Harris-Moore, who
15
was carrying a .380 semiautomatic pistol stolen from an unknown location, threatened to
16
shoot himself rather than be captured, but finally surrendered to police--after dumping a
17
stolen MacBook computer in the ocean.  Presentence Report, ¶ 44.
18

19            **July 11, 2010: Harris-Moore at marina, running with pistol,**
**minutes before his arrest**
20

21

22

23              

24

25

26

27

28

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    On July 14, 2010, Mr. Harris-Moore was expelled from the Bahamas and arrested in

2    Miami.  Presentence Report, ¶ 44.  The United States has received information suggesting

3    Mr. Harris-Moore accumulated a five-figure cash hoard, but lost it during his trip east.

4            **E.      Recent Statements by Mr. Harris-Moore**

5            Since his arrest July 14, 2010, Mr. Harris-Moore has spent most of his time

6    detained at the Federal Detention Center in Seatac, Washington.  FDC inmates are

7    informed that if they choose to make personal telephone calls or use email, they may be

8    monitored.  There is no expectation of privacy or attorney-client privilege associated with

9    the use of the FDC email system.

10           Mr. Harris-Moore has made a number of statements, in monitored emails and

11   telephone calls to friends and relatives, that appear inconsistent with the representations

12   he has made in his Letter to the Court.  The United States submits that these statements

13   should be taken into account in evaluating Mr. Harris-Moore's level of acceptance of

14   responsibility for his crimes.  The following are excerpts from Mr. Harris-Moore's Letter

15   to the Court, reprinted alongside related statements from his monitored emails and calls.

16           The state charges against Mr. Harris-Moore in Island, San Juan, and Snohomish

17   Counties were the subject of a consolidated plea and sentencing hearing held December

18   16, 2011, in Island County Superior Court in Coupeville.  The Island and San Juan

19   County cases were presented to the Court by Island County Prosecutor Greg Banks and

20   San Juan County Prosecutor Randy Gaylord, respectively.  Concerning the December 16

21   proceeding in Coupeville, Mr. Harris-Moore wrote:

22           "I would like to express my sincerest apologies to all victims.  I had
             absolutely no right to deprive my victims of their property or to enter their
23           homes . . . I know now that people did in fact feel terrorized . . . scared in
             their own homes.  I can only try to put into mere words my feelings on the
24           matter, and the loss of self-respect after having been responsible for that.
             To this end, I have plead guilty and accepted responsibility for these
25           actions."
             Harris-Moore's Letter to the Court, December 13, 2011, at 4
26

27

28

GOVERNMENT'S SENTENCING MEMORANDUM/HARRIS-MOORE
Case No. CR10-336-RAJ - 18

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

"[My lawyers] no doubt fought their asses off in Coupeville.  They weren't
having NONE of what Unethical Greg Banks or that complete FOOL
Randy Gaylord (Gaylord, really????) had to say.  Totally UNDID
everything they said.  Those guys looked like COMPLETE FOOLS and
asses."
Harris-Moore email to E.A., December 25, 2011

Mr. Harris-Moore's statements on surviving his first airplane theft, and the sentence

imposed December 16 by the Superior Court:

[On November 11, 2008,] "I fought and flew for my life . . . to this day I
remain somewhat amazed I am still alive.  Once I regained control of the
aircraft . . . I do believe that I was sandwiched between mountains at that
point, once again having made it out of a situation all odds said I shouldn't
have."
Harris-Moore's Letter to the Court, December 13, 2011, at 2-3

"Friday [December 16] marked the absolute climax of what was the worst
time of my life; a time when I sat at the entrance to a tunnel that could
have lasted years.  When all the acting and spreading of high propaganda
on the part of the state was over and my lawyers argued the true facts, the
judge gave me a much-appreciated recognition and validation, calling my
story a 'triumph of the human spirit.'  She wasn't having none of the weak
argument the prosecution tried to peddle, and ended up handing down a
sentence that was the lowest possible within the range . . . Once again, I
made it through a situation I shouldn't have[.]"
Harris-Moore email to J.L., December 22, 2011

Also regarding the sentences to be imposed in his criminal cases:

"Your Honor, the term of my sentence which you hand down, I will serve
with humility.  I was wrong and I made mistakes beyond what words can
express."
Harris-Moore's Letter to the Court, December 13, 2011

"So the citizens (and sheriffs) are appeased, justice is served.  It's all
political.  I'm thankful for the judge saying what she did, but at the same
time her words were greater than her actions - she had the ability as
invested in her by the people to create change, and the opportunity to stand
up with compassion, but didn't reach that potential."
Harris-Moore email to B.D., December 29, 2011

"[T]he sentence was at the lowest-end of the range . . . And I'll end up
doing less than half of that, too.  I won't be out tomorrow, but I have no
doubt I will emerge unscathed, with my plans back on track.  Just a matter
of time, no doubt."

Harris-Moore email to E.A., December 24, 2011

Regarding his aircraft thefts, and "glamorizing" his crimes:

> "I will continue to write and correspond with the individuals who have been inspired by my story . . . not to view me as a role model or what the media has created, but instead to learn form my mistakes and follow their own dreams . . .
> I hope that nothing I have said [in this letter] is misconstrued - though I described in detail my first flying experience, in no way whatsoever am I 'glamorizing' that event or anything else I have done."
> Harris-Moore's Letter to the Court, December 13, 2011, at 5, 6

> "[T]he things I have done as far as flying and airplanes goes, is amazing. Nobody on this planet have done what I have, except for the Wright brothers."
> Harris-Moore email to J.F., August 4, 2011

> [I]f someone I thought I was friends with or could trust doesn't value trust or that friendship . . . I'll just say 'see ya', or more accurately, CYA!"
> Harris-Moore email to E.A., December 25, 2011

Concerning the law enforcement agencies that investigated the case against him, including Island County Sheriff Mark Brown, Mr. Harris-Moore stated:

> "I would also like to extend my apologies to . . . the Island County and San Juan County Sheriffs Office, who I know were only doing their jobs."
> Harris-Moore's Letter to the Court, December 13, 2011, at 4

> [At court December 16], "the more people I have from my camp the better, because that's just one less seat that will be filled by the media vermin or the swine, the king swine himself, Mark Brown."
> Harris-Moore telephone call to P.K., December 9, 2011

Mr. Harris-Moore has criticized the State of Washington's arguments that he should receive a sentence at the high end of the range applicable to his crimes as an unjustified attempt to "destroy" his future:

> "This past 1.5 years has been a mixture of ridiculous and obscene, which equals complete fiasco. [The state sentencing was] the prosecutors' desperate attempt to make me out to be the worst person in the world . . . I literally cannot fathom how someone could actually wish misery on another person, let alone proactively promote a turn of events that would

get them a satisfaction and 'happiness' through putting someone in a cage. I can see but don't understand what would compel someone to have this mindless drive to ruin another persons life. . . someone tries to take your life away from you, destroy your future, and is so audacious as to feel justified in that cause."
Harris-Moore email to N.P., December 29, 2011

Regarding his control over his actions:

"Your Honor, I don't know where I could have broken the cycle. Each step of the way, I felt that I was more and more entrenched with a path, and the situation had taken a life of its own."
Harris-Moore's Letter to the Court, December 13, 2011, at 3-4

"In [November and December of 2011] I feared for my life - not like I did when I was on the run; where I was in full control of my life, and ultimately, my death- but rather from other (people) wanting to control my life and impose a sentence of years.  Years spend unfree, captive, held against my will."
Harris-Moore email to J.L., December 22, 2011

## IV.    SENTENCING GUIDELINES CALCULATIONS

The United States generally agrees with U.S. Probation's calculation of the advisory Sentencing Guidelines range, although it believes that at least one enhancement not imposed by U.S. Probation should apply to Mr. Harris-Moore.  For that reason, the United States calculates Mr. Harris-Moore's total offense level as 24, not 23, yielding an advisory Guidelines range of 77 to 96 months, rather than U.S. Probation's 70 to 87 month range.  Because of the relatively complicated nature of the Guidelines calculation in this case, the government will set forth its reasoning in detail.

### A.    Count 1: Bank Burglary

The parties agreed in the Plea Agreement, and U.S. Probation concurs, that the base offense level for the Count 1 bank burglary should be 12, under USSG §2B2.1(a)(2).

The United States submits that pursuant to Guidelines section 2B2.1(b)(1), the offense level associated with the Count 1 bank burglary should be increased by 2, because the offense involved "more than minimal planning."  Mr. Harris-Moore's scheme to attack the ATM safe at Islanders Bank in Eastsound involved at least three burglaries.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

Before the bank burglary, Mr. Harris-Moore burglarized the Ace Hardware store and the Orcas Homegrown Market in Eastsound, stealing tools that he believed would be useful in cracking the ATM safe. *See* Plea Agreement (Dkt #50), ¶ 12, page 10 (Ace Hardware burglary). Many of the tools were recovered at the bank, abandoned by Mr. Harris-Moore when he failed to open the safe. Under the application notes to Guidelines section 2B2.1(b)(1), committing several other crimes just to set up a charged crime would clearly constitute "more than minimal planning." This justifies the 2-level increase under 2B2.1(b)(1), making the total offense level 14.

### B. Counts 2, 6, and 7: Interstate Transportation of Stolen Aircraft and Stolen Vessel

#### 1. Grouping and Base Offense Level

Although the Plea Agreement (for purposes of clarity) sets forth stipulated base offense level and loss amounts for Counts 2, 6, and 7 individually, the United States agrees with U.S. Probation that under USSG §3D1.2(d), these counts group for purposes of sentencing. For that reason, the base offense level applicable to all three offenses is 6. The loss amount for counts 2 (the Bonners Ferry, ID Cessna), 6 (the Ilwaco boat), and 7 (the Bloomington, IN Cessna) aggregates to more than $1,000,000 but less than $2,500,000, corresponding to a 16-level increase under USSG §2B1.1(b)(1)(I).

#### 2. Enhancement: Conscious or Reckless Risk of Death or Serious Injury

The United States agrees with U.S. Probation that under Guidelines section 2B1.1(b)(13)(A), the total offense level associated with this group should be increased by 2, because the aircraft thefts in Counts 2 and 7 involved the "conscious or reckless risk of death or serious bodily injury." *See* Presentence Report, ¶ 60.

Mr. Harris-Moore had no pilot's license or training from a certified instructor, but trained himself in the basics of flying single-engine aircraft, and then stole and flew multiple aircraft. *See* Defendant's Letter to the Court, at 2-3. Mr. Harris-Moore has admitted that his first flight in a stolen aircraft, on November 11, 2008, made him feel immediately after takeoff that he was "probably going to die." *Id.* While incarcerated,

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

Mr. Harris-Moore has bragged about the dangerousness of his flights, including those

charged here:

> I, as a teenager with no formal education in aviation, was not only able to
> pilot multiple aircraft, fly one over a thousand miles to the Bahamas.  Four
> out of the five airplanes were flown through inclement weather or night
> time- or both, again, without any formal training.  I am confident that
> anyone else would have died - you cant just jump in an airplane and fly at
> night or through weather; you HAVE to be instrument-rated, but I wasn't
> and actually taught myself how to fly instrument, which is inconceivable to
> most pilots and ALL instructors.

Harris-Moore email to J.F., August 4, 2011.  If it was clear to Mr. Harris-Moore by 2008

that untrained flights in stolen aircraft were potentially fatal to him, it is certain that

during the commission of Count 2 in 2009 and Count 7 in 2010, he was "conscious" or

"reckless" that his actions risked "death or serious bodily injury" to himself and others.

   Mr. Harris-Moore compounded these risks during all of his plane thefts by flying

the stolen aircraft with no flight plan, and intentionally failing to communicate with air

traffic control or other aircraft, even when flying at night.  In the Idaho and Indiana thefts

(Counts 2 and 7), his unsafe flights lasted for hours, until he ran the aircraft out of fuel

and was forced to crash-land them.

   The Ninth Circuit has repeatedly upheld the district court's imposition of the

Section 2B1.1(b)(13)(A) enhancement when a defendant's conduct creates a risk of death

or serious injury, regardless of whether actual harm results.  In *United States v. West

Coast Aluminum Heat Treating Co.*, 265 F.3d 986 (9th Cir. 2001), the enhancement

(under Section 2F1.1, later merged with 2B1.1) was upheld as to a defense contractor that

falsely certified it had tested military parts, including "flight critical" aircraft parts, to

rigorous government standards.  Although there had been no accidents, the Ninth Circuit

held that "[w]hen the consequences of failure are catastrophic, a low failure frequency is

of limited relevance.  It is the creation of risk, not the infliction of injury, that is required

for the application of this guideline provision . . . even if the ultimate probability of

occurrence is found to be relatively low."  *Id*. at 992-93; *see also United States v. Awad*,

551 F.3d 930, 941-42 (9th Cir. 2009) (enhancement imposed on physician who failed to

supervise many patients' treatments in the course of a Medicare fraud scheme, even though no patients suffered adverse reactions); *United States v. Johansson*, 249 F.3d 848, 859-61 (9th Cir. 2001) (trucking company, falsifying logs to conceal drivers' excessive road hours, created risk of injury from fatigued drivers even if no accidents resulted).

There can be no real dispute that Mr. Harris-Moore's self-trained, clandestine flights carried with them a risk of death or serious injury to innocent bystanders, whether through a crash into the ground or a mid-air collision. The Ninth Circuit has upheld the imposition of the 2-level enhancement under §2B1.1(b)(13)(A) in various situations that created less direct danger to the public. The United States agrees with U.S. Probation that the Court should impose this enhancement.

### 3.     Enhancement: Possession of a Firearm

The United States further submits that in the alternative to an enhancement under Guidelines section 2B1.1(b)(13)(A), for a conscious or reckless risk of death or serious injury, the total offense level associated with the group including Count 2 should be increased by 2 pursuant to Guidelines section 2B1.1(b)(13)(B), because Mr. Harris-Moore possessed a firearm in connection with the Idaho aircraft theft. When Mr. Harris-Moore stole P.G.'s Cessna from the Boundary County airport, he was carrying the loaded .32 pistol that he had stolen from British Columbia. While the enhancement only requires that the weapon be possessed, there is every reason to believe carrying this weapon facilitated the theft by emboldening Mr. Harris-Moore. As his later actions show, being armed made him less concerned about encountering a homeowner or police officer, and more assured of his ability to escape. Less than a week after the Bonners Ferry theft, he used a stolen pistol to fire a shot to ward off the Snohomish County deputies who were chasing him.

### 4.     Enhancement: Use of a Special Skill

The United States submits that pursuant to Guidelines section 3B1.3, the Group 2 offense level should also be increased by 2 because the offenses in Counts 2 and 7 involved the use of a "special skill" that "significantly facilitated the commission or

GOVERNMENT'S SENTENCING MEMORANDUM/HARRIS-MOORE
Case No. CR10-336-RAJ - 24

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

concealment of the offense[.]"  Mr. Harris-Moore acquired such a skill by training

himself to fly in single-engine aircraft.  The Application Notes to 3B1.3 state:

> "Special skill" refers to a skill not possessed by members of the general
> public and *usually* requiring substantial education, training or licensing.
> Examples would include *pilots*, lawyers, doctors, accountants, chemists, and
> demolition experts.

Guidelines section 3B1.3, Application Note 4 (emphasis added).

This enhancement fits Mr. Harris-Moore's aircraft thefts in two ways.  First, Mr.

Harris-Moore would not have been able to commit the crimes at all without acquiring the

skill to take off and fly in the planes.  In his Letter to the Court, Mr. Harris-Moore

describes his intense and prolonged effort to acquire pilot skills:

> During the summer and fall of 2008 . . . I dedicated each day to bicycling
> ten miles a day from a mountain campsite to Orcas Island Airport to see
> planes taking off and landing and on several occasions I stole airplane
> manuals. During the day I was perched on a cliff listening to NAV/COM
> VHF airport frequencies which narrated the comings and goings of
> airplanes at local airports. I was infatuated with airplane operations and
> dedicated my days and nights to learning everything I could. The study of
> the manuals, navigation and avionics manuals, and thousands of online
> videos of aircraft systems operations through the eyes of the pilots were my
> school.

Letter, at 2; *see also* Harris-Moore email to J.F., August 4, 2011 (asserting that his self-

taught skills were so sophisticated as to be "inconceivable to most pilots and ALL

instructors.").  Mr. Harris-Moore deliberately avoided legitimate licensing or training

because he wished to steal aircraft while he was a fugitive from the law.  Nevertheless, it

is clear from his own statements and from the recovered evidence that he spent hundreds

of hours training himself by reading stolen manuals and watching "thousands" of videos,

before flying five real aircraft.

The Guidelines do not limit the special skill enhancement to people who abuse

legitimate licenses or genuine professional qualifications.  Rather, 3B1.3 encompasses

skills, like Mr. Harris-Moore's, that would *usually* require substantial training and

licensing.  In *United States v. Barnes*, 125 F.3d 1287, 1292 (9th Cir. 1997), the Ninth

Circuit affirmed the application of 3B1.3 enhancement to a defendant who impersonated

GOVERNMENT'S SENTENCING MEMORANDUM/HARRIS-MOORE
Case No. CR10-336-RAJ - 25

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

a licensed physician to practice medicine, holding he "certainly employed a 'special skill not possessed by members of the general public' in perpetrating his fraud."

**Evidence of pilot training: Stolen Cirrus flight manual, Eastsound "hangar hide"; "Flying in Boundary County" (Idaho) disc case, found on Camano Is., Nov. '09**

 

Other Ninth Circuit caselaw supports the imposition of the 3B1.3 enhancement to Mr. Harris-Moore. *See, e.g., United States v. Corona-Verbera*, 509 F.3d 1105, 1120-21 (9th Cir. 2007) (applying enhancement to architect who helped construct drug smuggling tunnel). *Corona-Verbera* states that the court applies a two-part test to determine whether a skill constitutes a "special skill" under the Guidelines: "First, we determine whether the skill is possessed by members of the general public." If it is not, and has a legitimate application outside the criminal context, "[s]econd, we determine whether the skill requires substantial training, education or licensing, and is analogous to the skills described in the application note." *Id*. (citing *United States v. Mendoza*, 78 F.3d 460, 465 (9th Cir. 1996), holding that "driving an eighteen-wheeler [truck] without mishap over a period of several years does constitute a special skill because it is a skill well beyond that possessed by the general public."). Mr. Harris-Moore's skills satisfy both parts of the Ninth Circuit's test.

The "special skill" enhancement is also appropriate because the airplane thefts were made possible by the special nature of Mr. Harris-Moore's training and targets. Mr. Harris-Moore sought out light aircraft with few security features stored at minimally guarded general aviation airports. These aircraft and airports had low security precisely

GOVERNMENT'S SENTENCING MEMORANDUM/HARRIS-MOORE
Case No. CR10-336-RAJ - 26

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

because there are very few people who lack formal pilot training but nevertheless have the desire and ability to abscond with a light aircraft. Conversely, virtually no one who had gone through the difficulty and expense of acquiring real pilot's training and licensing would risk license revocation by stealing someone else's plane.

In sum, the skill of piloting light aircraft required substantial training even for Mr. Harris-Moore; it is a legitimate skill not possessed by members of the general public; and it is among the skills specifically listed in the Application Notes to Section 3B1.3. Mr. Harris-Moore's acquisition of his pilot skills "significantly facilitated the commission . . . of the offense" of Interstate Transportation of Stolen Aircraft, and the two-level enhancement under 3B1.3 should also be applied to this group.

### 5.   Imposition of both the "Risk of Injury" and "Special Skill" Enhancements

Mr. Harris-Moore may contend that the Court should not impose both the Section 2B1.1(b)(13)(A) "risk of injury" and Section 3B1.3 "special skill" enhancements, on the theory that if he was a good enough pilot for his skills to be considered "special," he could not also have caused a substantial risk of death or injury while flying. The enhancements are not mutually exclusive, however. Mr. Harris-Moore learned to fly aircraft well enough that it can be called a "special skill," but he still *chose* to fly his stolen planes in an especially dangerous manner: avoiding filing flight plans or making radio transmissions (even at night), in order to evade detection of his crimes, and flying aircraft as far as he could, until he ran out of fuel and crashed (both Counts 2 and 7).

In the alternative, if the Court chose to impose the firearm enhancement under 2B1.1(b)(13)(B) rather than the "risk of injury" enhancement under 2B1.1(b)(13)(A), it would be entirely consistent for the Court to also impose the 3B1.3 "special skill" enhancement.

### 6.   Group 2 totals

In total, for the group that includes Counts 2, 6, and 7, there is a base offense level of 6 and an increase of +16 for the loss amount. The Court should also apply a 2-level

GOVERNMENT'S SENTENCING MEMORANDUM/HARRIS-MOORE
Case No. CR10-336-RAJ - 27

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

enhancement under either section 2B1.1(b)(13)(A), for a conscious or reckless risk of death or injury, or 2B1.1(b)(13)(B), for possession of a dangerous weapon; and a 2-level enhancement under section 3B1.3, for use of a special skill.  These give the group an adjusted offense level subtotal of 26.

## C.      Counts 3 and 4: Firearms Offenses

The United States agrees with U.S. Probation that Counts 3 and 4 group under USSG §3D1.2(d).  The Plea Agreement specifies that the base offense level as to each count is 14; that each count should receive a 2-level increase under USSG §2K2.1(b)(4) for involving a stolen firearm; and that each count should receive a 4-level increase under USSG §2K2.1(b)(6) because the firearms were possessed in connection with other felony offenses.  The United States agrees with U.S. Probation that the adjusted offense level subtotal for this group is 20.

## D.      Count 5: Airman's Certificate Violation

The United States agrees with U.S. Probation's conclusion that the Count 5 offense may be considered an aggravating circumstance and/or sentencing factor under 18 U.S.C. § 3553(a), and/or may be grouped with the Counts 2 and 7 offenses.

## E.      Total Offense Level Calculation

Applying all of the Guidelines enhancements listed above, the government's total offense level calculation is as follows:

| Group 1: Count 1- Bank Burglary | |
|---|---|
| Base offense level, §2B2.1 | 12 |
| More than Minimal Planning, §2B2.1(b)(13)(A) | +2 |
| **Group 1 / Count 1 subtotal** | **14** |
| **Group 2: Counts 2, 6, and 7 - Interstate Transportation of Stolen Aircraft and Stolen Vessel** | |
| Base offense level, §2B1.1 (based on aggregate loss amount) | 6 |

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

| | |
|---|---|
| Increase for aggregate loss amount between $1,000,000 and $2,500,000, §2B1.1(b)(1)(I) | +16 |
| Increase for conscious or reckless risk of death or serious bodily injury, 2B1.1(b)(13)(A), or possession of a dangerous weapon, 2B1.1(b)(13)(B) | +2 |
| Increase for use of a special skill, 3B1.3 | +2 |
| **Group 2 / Counts 2, 6, and 7 subtotal** | **26** |

| | |
|---|---|
| **Group 3: Counts 3 and 4 - Firearms Offenses** | |
| Base offense level, §2K2.1 | 14 |
| Offenses involving stolen firearms, §2K2.1(b)(4) | +2 |
| Possession in connection with another felony offense, §2K2.1(b)(6) | +4 |
| **Group 3 / Counts 3 and 4 subtotal** | **20** |

| | |
|---|---|
| **Multiple Count Adjustment, §3D1.4** | |
| Group 1: Adjusted Offense Level 14 | 0 Units |
| Group 2: Adjusted Offense Level 26 | 1 Unit |
| Group 3: Adjusted Offense Level 20 | ½ Unit |
| Subtotal of Multiple Count Adjustment Units | 1 ½ Units |
| **Multiple Count Increase in Total Offense Level** | **1 Level** |

| | |
|---|---|
| Applicable Group Adjusted Offense Level: Group 2 (highest applicable group) | 26 |
| **Combined Adjusted Offense Level (Group 2 = 26, +1 Level Multiple Count Increase)** | **27** |
| Adjustment for Acceptance of Responsibility, §3E1.1(b) | -3 |
| **Total Offense Level** | **24** |

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

### F.      Criminal History Category

The United States agrees with U.S. Probation's calculation of Mr. Harris-Moore's criminal history category as IV.  This is based on one criminal history point for his March 2005 convictions for theft; one point for his July 2006 conviction for burglary; two points for his June 2007 convictions for burglary; three points for his December 2011 convictions in Island County; and two points for committing the instant offenses while on escape status, under Guidelines section §4A1.1(d), for a total of nine points.

It should be noted that this history could be even higher, except that so many of Mr. Harris-Moore's felonies were consolidated as relevant conduct in this plea, or were the subject of the single, consolidated plea in Island County Superior Court on December 16, 2011.

### G.      Advisory Guidelines range

Based on a total offense level of 24 and a criminal history category of IV, the advisory Guidelines range calculated by the United States is 77 to 96 months' imprisonment.

## V.      GOVERNMENT'S SENTENCING RECOMMENDATION

The United States respectfully recommends a sentence of 78 months' imprisonment.  This sentence is at the high end of the range in the Plea Agreement in which the parties agreed to make their recommendations.  It falls in the middle of the Guidelines range calculated by U.S. Probation, however, and near the low end of the Guidelines range calculated by the United States.  The United States also agrees with U.S. Probation's recommendation that the federal sentence of imprisonment be made consecutive to Mr. Harris-Moore's undischarged term of state imprisonment.  As set forth below, this recommended sentence is appropriate in light of the facts and circumstances of the case, including factors set forth in 18 U.S.C. § 3553(a).

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

## A.     The Nature and Circumstances of the Offenses (3553(a)(1))

Through careful planning and dogged persistence, Mr. Harris-Moore committed dozens of felonies that caused well over a million dollars in damages.  He scouted and targeted poorly defended homes, businesses, vehicles and aircraft.  Most were in isolated and rural areas, where crime rates were otherwise low, law enforcement was usually far away, and his chances of escape were high.  He stole as much cash as he could find.  Where there was expensive loot, like an ATM safe or an aircraft, he engaged in multiple-step attacks, stockpiling stolen tools or digesting instructional videos in advance.  He pre-planned escape and self-protection strategies, including building his concealed hiding place at the Eastsound airport, and stealing multiple guns.  He carried those guns, fired one to escape from police, and threatened to shoot a homeowner who cornered him.

When Mr. Harris-Moore was searching for an aircraft to steal, he went from one rural airport to the next, over and over again, breaking into any businesses or homes that he thought would sustain his crime spree without causing him to be caught.  He stole any property that he felt like using and could carry away with him.  As he fled with the vehicles he stole, he was indifferent to the damage he caused.  He wrecked aircraft, left boats adrift on the water, and left abandoned cars open to the elements.

Mr. Harris-Moore employed these carefully developed tactics in service of a larger strategy: to escape from the justice system to the Caribbean, using a stolen plane, carrying his stolen cash.  This was his plan no later than the fall of 2009, and possibly earlier.  By July of 2010, through a diligent series of burglaries and vehicle thefts, he was finally able to put that plan into practice.  He did all of this while a fugitive from justice.

There is no explanation for this crime spree other than Mr. Harris-Moore's decision to live an exciting and profitable life on the lam.  It appears most likely that once he had stolen his first airplane in 2008, Mr. Harris-Moore simply decided to enjoy his freedom, his stolen planes and cash, and the newfound Internet celebrity status glowing on his stolen computers, for as long as he possibly could before having to face any punishment.

GOVERNMENT'S SENTENCING MEMORANDUM/HARRIS-MOORE
Case No. CR10-336-RAJ - 31

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

**B.     The History and Characteristics of the Defendant (3553(a)(1))**

Mr. Harris-Moore had an extensive juvenile criminal record even before the start of his current crime spree.  As the Presentence Report notes, Mr. Harris-Moore had been committing crimes, and had repeatedly been in the criminal justice system, since his early teens.  Notably, when he was arrested for multiple residential burglaries in 2007, he was caught with a .45 caliber handgun.  Presentence Report, ¶¶ 94-95.  He was serving a three-year juvenile sentence for those burglaries when he escaped in April of 2008.

As noted above, in his Letter to the Court, Mr. Harris-Moore claims that stealing his first airplane while he was a fugitive, November 11, 2008, "changed my life forever . . . opened my mind and gave me insight into not only myself, but the world; valuable life lessons that I believe I couldn't have learned any other way."  Letter to the Court, at 3.  He also claims that he did not stop committing crimes after that theft because "I don't know where I could have broken the cycle" and "the situation had taken [on] a life of its own."  *Id*.

These statements do not come close to justifying Mr. Harris-Moore's decisions after November 11, 2008.  With his life supposedly "changed forever," he picked up right where he left off before his juvenile sentence, committing new residential burglaries.  In fact, his crimes escalated sharply, as he now chose to steal multiple vehicles and aircraft, and additional firearms.  As noted above, contrary to his claim that "the situation" had a life of its own, he admitted in a recent email to a friend that "on the run . . . I was in *full control* of my life, and ultimately, my death."  Email to J.L., Dec. 22, 2011 (emphasis added).

Mr. Harris-Moore states that during his crime spree, "I knew my intentions and that I would never hurt anyone or intentionally scare someone, and I mistakenly assumed people knew that as well."  Letter to the Court, at 4.  These claims are belied by his actions.  When threatened or cornered, Harris-Moore repeatedly and intentionally threatened others in order to avoid capture and keep his crime spree going.  He pepper sprayed the sheriff's deputy on Orcas in fall of 2008.  He fired a shot near sheriff's

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

deputies outside Granite Falls, and he threatened to shoot Mr. K in Yankton with what appeared to be a laser-sighted gun. When no one shot back at him, Harris-Moore took this restraint as an invitation to continue running away, so he could keep committing his crimes. Only the Bahamian police riddling his stolen boat with gunfire finally convinced him to stop, and even then, he did so only after bluffing that he would kill himself before going back to jail.

Mr. Harris-Moore has denied that he wanted any of the fame associated with his crimes, but here too his actions suggest otherwise. He did not take the time to draw bare footprints in a business he was burglarizing, and leave a signed "donation" at a veterinary clinic, because he hated the attention and publicity those messages were sure to provoke. He did not videotape himself driving across the country in stolen vehicles, and in the cockpit flying to the Bahamas, because he was frightened of what he was doing. Instead, his own statements and actions reveal that while he was on the run, he was regularly checking on his rising celebrity on Facebook and the Internet.

As his mitigation materials suggest, Mr. Harris-Moore had a very difficult childhood, and may suffer from multiple medical problems. But nothing in his materials suggests he was ever unable to tell right from wrong. Instead, he chose to ignore the wrongfulness of his conduct. His crimes were entirely self-interested and greedy. His entertainment, enrichment, and continued freedom were his highest priorities. They were far more important to him than the safety of other people, the comfort of other people in their homes, or the security of anyone else's property.

C.    The Seriousness of the Offenses (3553(a)(2)(A))

Many of Mr. Harris-Moore's crimes are considered "economic," and are calculated under Guidelines section 2B1.1. The high monetary losses caused by Mr. Harris-Moore are obvious. But the statements submitted by Mr. Harris-Moore's victims highlight that even these "economic" crimes caused danger to the public, and caused psychological damage to their victims that cannot be cured through monetary restitution.

GOVERNMENT'S SENTENCING MEMORANDUM/HARRIS-MOORE
Case No. CR10-336-RAJ - 33

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

Victim P.G., the owner of one of the stolen aircraft (Count 2), speaks perceptively of the danger Mr. Harris-Moore caused through his unlicensed flights.  P.G. writes that "[i]n Colton's hands, the airplane was a dangerous weapon set loose by one young man with no conscience on an innocent public."  Victim Impact Statement of P.G., at 1.

At the Superior Court sentencing on December 16, victim R.G., whose home was burglarized and whose firearm was stolen (Count 4), spoke of the impacts of Mr. Harris-Moore's crimes:

> [T]his is life-changing. We have to install a security system in our house. We have to start worrying what's around our house . . . I mean, it's -- it's very uneasy.  You've been violated . . . they say, well, he hasn't hurt anybody.  Well, he does hurt people.  It's a lot of hurt to know, can you leave your wife at home on a weekend?  Can she feel safe in your own home?  Do you have to look and see who's running through the windows every time you're coming up your driveway?

Transcript, Island County Superior Court, December 16, 2011, at 49-50.

Victims S.J. and M.M. live in Idaho, hundreds of miles apart from each other, but both were burglarized by Mr. Harris-Moore: S.J. in September 2009, and M.M. in June 2010.  Both describe very similar reactions to these crimes, such as their children being fearful of burglars, and not wanting to go into unoccupied spaces by themselves.  They write that they have experienced a significant loss of trust since the burglaries, and feel like they must always lock doors that were left open before they encountered Mr. Harris-Moore.  *See* Victim Impact Statement of S.J.; Victim Impact Statement of M.M.

**D.    Promoting Respect for the Law, Deterring Criminal Conduct, Avoiding Unwarranted Disparities, and the Need for Just Punishment (3553(a)(2) - (a)(6))**

The sheer number of crimes involved in this case warrants the 78 month sentence recommended by U.S. Probation and the United States.  As noted above, seven felonies were pled to in the Plea Agreement.  At least 27 other crimes, mostly felonies, are recognized as relevant conduct.  No other case is exactly like this one, but in its number and scope of crimes, it is most similar to the complex fraud schemes or drug trafficking conspiracy cases that come before this Court.  Any sentence of less than 78 months would

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

raise the possibility that the dozens of felonies being punished in this sentencing would receive an excessively light punishment, relative to those imposed on other defendants with similar records.  A lighter sentence could also afford an inadequate deterrent to the criminal conduct of others, by failing to emphasize the seriousness of Mr. Harris-Moore's conduct.

**E.      Sentencing Guidelines (3553(a)(4))**

As discussed elsewhere in this Memorandum, the 78 month sentence recommended by the United States is in the middle of the Guidelines range calculated by U.S. Probation, and at the low end of the Guidelines range calculated by the United States.  These calculations are based upon the offenses charged in the Superseding Information, and do not specifically include the offenses acknowledged as relevant conduct in the Plea Agreement's Statement of Facts.  Although the Guidelines are not binding upon the Court, they indicate the reasonableness of the proposed sentence.

**F.      Restitution to Victims (3553(a)(7))**

The United States requests that the Court enter the government's proposed Order of Restitution.  By agreement of the parties, this will direct restitution to three groups of victims: victims of crimes listed in the federal Superseding Information; victims of crimes listed as relevant conduct in the Plea Agreement; and victims of crimes named in the consolidated pleas and restitution orders entered in Island County Superior Court on December 16.  Under 18 U.S.C. § 3664(j)(1), the parties submit that the order should provide that uninsured losses receive first priority.  The proposed Order of Restitution is still being finalized, but will amount to not less than $1,271,236.60.

The United States expects that virtually all restitution that may be paid any time soon will come from the film contract signed by Mr. Harris-Moore.  That contract is subject to the restrictions and conditions imposed in the Plea Agreement, to make sure that it exists solely for the benefit of Mr. Harris-Moore's victims.  It is worth noting, however, that the film contract is an option contract that has not yet been fully exercised. Even if the option is exercised, the maximum net amount of funds that will come from the

GOVERNMENT'S SENTENCING MEMORANDUM/HARRIS-MOORE
Case No. CR10-336-RAJ - 35

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

contract will likely be just over $1 million.  This will not be sufficient to compensate all the victims for all of the damage that Mr. Harris-Moore caused them.  Thus, no matter what happens, it is quite possible that the victims of Mr. Harris-Moore's crimes will never receive full restitution for their pecuniary losses.

It is also important to note that any restitution that flows from the film contract to the victims is really just additional proceeds of Mr. Harris-Moore's crimes.  Simply put, Mr. Harris-Moore is selling the story of his crimes to a film company.  This fact made the idea of allowing him to make that sale extremely problematic for the government.  The United States wanted to do everything it could to ensure as much restitution as possible went to the victims.  At the same time, the last thing the government wanted to do was to support anyone, including a filmmaker, who intended to glorify what Mr. Harris-Moore did, or gloss over the damage he caused to the public.  Given those competing concerns, the United States worked hard to ensure through the Plea Agreement, and its work with the Special Master, that what Mr. Harris-Moore would be allowed to sell would only benefit his victims, and could not easily be used for the sole purpose of celebrating his crimes.

All parties can be glad that the film, if made, will substantially fund restitution.  But the film is a relatively cost-free effort for Mr. Harris-Moore, which merely requires him to say whatever he wants, about himself and his crimes, to a screenwriter.  It will not provide full restitution, and it should not justify any substantial reduction in his sentence.

### G.   Incarceration, Concurrent and Consecutive Sentencing, and Application of Guidelines section 5G1.3(a)

Under paragraph 9 of the Plea Agreement (Dkt #50), the United States hereby requests that the Court recommend that the Bureau of Prisons "designate a Washington state facility as the place at which Mr. Harris-Moore shall serve his federal sentence, pursuant to 18 U.S.C. § 3621(b)."  The United States has further agreed to recommend, and hereby recommends, that any sentence imposed by the Court in this case be

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

designated as concurrent with the 87-month sentence imposed December 16 by the Superior Court of Washington for Island County.

While he committed the crimes in this case, however, Mr. Harris-Moore was a fugitive from an undischarged State of Washington juvenile sentence. On June 27, 2007, he was sentenced to 52 to 65 weeks' confinement on each of three counts of residential burglary. Presentence Report, ¶ 94. When he escaped from the Griffin Home on April 29, 2008, he had approximately two years remaining on his sentence. Under Washington law, Mr. Harris-Moore's new Washington sentence of 87 months (imposed December 16, 2011) must be served consecutive to the undischarged juvenile sentence, which continues in force until Mr. Harris-Moore turns 21, on March 22, 2012. On March 22, 2012, therefore, the new 87 month Washington sentence will begin to run.

As the Presentence Report notes, Section 5G1.3(a) of the Sentencing Guidelines provides:

> If the instant offense was committed while the defendant was serving a term of imprisonment (including work release, furlough, or escape status) . . . the sentence for the instant offense shall be imposed to run consecutively to the undischarged term of imprisonment.

*Id.*; *see also* Presentence Report, ¶ 145. The imposition of a consecutive sentence under Section 5G1.3(a) is not a departure from the Sentencing Guidelines. *See United States v. Fifield*, 432 F.3d 1056, 1061 (9th Cir. 2005). Despite the section's use of the word "shall," the Guidelines themselves are advisory, and the Ninth Circuit has held that the sentencing court retains the discretion to impose a consecutive, partially concurrent, or concurrent sentence. *See, e.g., United States v. Lail*, 963 F.2d 263, 264 (9th Cir. 1992).

The United States agrees with U.S. Probation's recommendation that under Section 5G1.3(a), the Court should choose to make Mr. Harris-Moore's new federal sentence consecutive to his undischarged Washington juvenile sentence. This will avoid granting Mr. Harris-Moore double credit for time spent in custody, and will conform to the way his state sentences are treated under Washington law. If Mr. Harris-Moore had been arrested by local authorities in the State of Washington, he would not have received

any credit for time spent in custody until he completed his full prior term. The fact that he managed to escape to the Bahamas before being arrested should not result in him serving *less* total time in custody. That would be the result, however, if his time spent in federal custody prior to this sentencing was double-counted towards both his new federal sentence and his prior undischarged state sentence. Effectively, his escape from custody in 2008 would be rewarded with a shorter sentence for the federal crimes he decided to commit while he was a state fugitive.

Thus, following U.S. Probation's recommendation, any sentence of imprisonment imposed by this Court should be made consecutive to Mr. Harris-Moore's previous undischarged Washington conviction under Guidelines section 5G1.3(a). This should mean that Mr. Harris-Moore will receive no credit towards his *federal* term of imprisonment for the federal time he has served to date. But all time Mr. Harris-Moore has spent in federal custody starting on July 14, 2010, up until his 21st birthday on March 22, 2012, *will* be credited towards satisfying his undischarged Washington Department of Corrections sentence that he escaped from in 2008.

## VI.    CONCLUSION

Mr. Harris-Moore dedicated intense effort to committing a lengthy string of felonies, for no purpose other than to enrich and amuse himself. He continued perpetrating those crimes, fleeing from one jurisdiction to the next, as long as he possibly could. Nothing about his childhood required him to take these actions. They were his conscious and deliberate choices, and he knew they were wrong. A fair sentence will take into account the significant damage he caused; his indifference to the feelings of his many victims, and to the danger he might be causing the public; his use of threats and stolen guns to avoid capture; and the continuing questions about the true extent of his remorse.

The sentence recommended by the United States and U.S. Probation is entirely reasonable given the number and the nature of Mr. Harris-Moore's crimes, and it is

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   appropriate under the factors set forth in 18 U.S.C. § 3553(a).  The 78 month term is in

2   the middle of the Guidelines range calculated by U.S. Probation, and near the low end of

3   the Guidelines range calculated by the United States.  This adequately recognizes the

4   mitigating factors, such as Mr. Harris-Moore's difficult childhood, that are present in this

5   case, while imposing just punishment for the high number of crimes he committed.

6        For all the foregoing reasons, the United States respectfully requests the Court

7   impose a 78 month term of imprisonment, consecutive to Mr. Harris-Moore's

8   undischarged juvenile sentence, and 3 years of supervised release, with all the special

9   conditions of supervision recommended by U.S. Probation.  The United States also

10   requests that the Court enter the government's proposed Order of Restitution and the

11   Preliminary Order of Forfeiture.

12        DATED this 24th day of January, 2012.

13                    Respectfully submitted:

15                  JENNY A. DURKAN
                     United States Attorney

16

17                   s/ Darwin P. Roberts
                     DARWIN P. ROBERTS, WSBA #32539
                     MICHAEL DION

18                   Assistant United States Attorneys
                     700 Stewart Street, Suite 5220

19                   Seattle, Washington 98101-1271
                     Phone: 206-553-7970  Fax: 206-553-0755

20

21

22

23

24

25

26

27

28