.

THE HONORABLE RICHARD A. JONES

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

UNITED STATES OF AMERICA,

Plaintiff,

v.

COLTON HARRIS-MOORE,

Defendant.

No.  CR10-336RAJ

RESPONSE TO GOVERNMENT'S
SENTENCING MEMORANDUM

## I.    INTRODUCTION

Colton Harris-Moore, by and through his undersigned counsel, hereby submits this Response to the Government's Sentencing Memorandum (Dkt. # 57).  This response addresses four issues raised in the government's memorandum: (1) the significance of selected emails Mr. Harris-Moore sent to his friends and family while in federal custody; (2) whether the special skill enhancement should be applied to an ineffectual "pilot"; (3) the order of pleas between the state and federal courts and how that affects the determination of the appropriate sentence in this case; and (4) whether Mr. Harris-Moore assaulted an officer on Orcas Island by "pepper spraying" him.

## II.   EMAILS SENT TO FRIENDS AND FAMILY FROM THE FDC

Based on selected excerpts from Mr. Harris-Moore's emails to his friends and family sent from the Federal Detention Center, the government contends that: "there are good reasons to question whether Mr. Harris-Moore's public expressions of remorse and acceptance of responsibility are entirely genuine." Gov't Sentencing Memorandum, pg. 3.

RESPONSE TO GOVERNMENT'S
SENTENCING MEMORANDUM- 1

1   Quotes are carefully lifted - sometimes out of context and sometimes from a stream of
2   emails where Colton is clearly processing what he has done and what has happened in
3   Court.  Other ideas are attributed to Colton when it is clear from a review of the entire
4   chain of correspondence that Colton got the idea from a friend's suggestion or
5   misunderstood a comment made to the press by a prosecutor. These quotes are cleverly
6   placed next to pieces of Colton's Letter to the Court.  The question is: what do these
7   pieces of thoughts sent to friends really tell the Court about how Colton feels about what
8   he has done and whether he is remorseful?  That question is best answered in two ways.
9   First, by remembering how young Colton is, his extreme vulnerability to the suggestions
10  of others, and his historical relationship with authority figures.  And then by placing the
11  inflammatory quotes back in the context where they belong: among Colton's other
12  thoughts about his state sentencing, his regret for what he has done, his overriding desire
13  to make things right, and his hopes for the future.

### A.    A Suggestible and Naïve Adolescent Venting to his Friends

Colton Harris-Moore is at times naïve and grandiose.  He is provisionally diagnosed with Alcohol Related Neurodevelopmental Disorder and is extraordinarily suggestible.  In the emails produced by the government on January 23, 2012, it is notable and somewhat alarming that Colton has accepted offers of friendship from people he has never met and knows nothing about.  While Colton often seems to be testing the trustworthiness of these individuals, by asking them to promise not to speak to the media about him and by asking them what their true intent is, he easily goes along with their desire to correspond and shares his feelings about his troubles within the criminal justice system and personal details about his life, his hopes, and his dreams.  As described in detail below, when one of these individuals suggests that Judge Churchill's actions were not as great as her words, Colton instantly agrees with the idea and emails it to someone else.  This lack of appropriate caution and willingness to temporarily adopt the opinions of others is born out in the testing conducted by Dr. Richard Adler.

On May 24, 2011, Dr. Adler met with Colton and administered the Gudjonsson Suggestibilty Scale-2 (GSS-2).  Defense Sentencing Memorandum, Ex. E at 29.   The GSS-2 tests an individual's susceptibility to another person's perception of the same

RESPONSE TO GOVERNMENT'S
SENTENCING MEMORANDUM- 2

LAW OFFICES OF JOHN HENRY BROWNE, P.S.
200 DELMAR BUILDING
108 S. WASHINGTON STREET
SEATTLE, WASHINGTON  98104
(206) 388-0777 • FAX: (206) 388-0780

information provided to the test-taker.  As seen in the chart below, Colton is more vulnerable to suggestion than the typical 11 to 12 year-old child.

<u>GSS-2 DATA</u>

| CATEGORY | MAXIMUM POSSIBLE SCORE | TYPICAL 11-12 YEAR OLDS [4] | COLTON'S SCORE | ADULT NORMS [7] |
|---|---|---|---|---|
| Immediate Recall | 40 | 17.1 | 12 | 18.9 |
| Delayed Recall | 40 | -- | 5 | -- |
| Yield 1 | 15 | 4.6 | 3 | 3.4 |
| Shift | 20 | 3.4 | 7 | 4.0 |
| TOTAL SUGGESTIBILITY | 35 | 8.0 | 10 | 7.4 |

Despite all of that, he is also simply an adolescent, 20 year-old kid who sometimes takes things a little personally and likes to be "tough" for his friends.  The boasting and derisive criticisms of authority, the bragging and excitement in receiving a lower sentence seen in these excerpts could have been written by any adolescent, on any given day, in any email to a friend or confidante.  And like so many instant and impulsive communications between adolescents, not all of it is pretty.  But it should not be readily assumed that these comments mean Colton is ungrateful for the sentence he received in Island County, oblivious to the harm he caused to others, or unwilling to try to make amends.

**B.      Reactions to the Sentence in Island County**

Colton is grateful for the sentence he received on December 16, 2011, by Judge Churchill in Island County.  The government has taken a portion of one email out of many where Colton describes his feelings about the sentencing hearing and used it to suggest that Colton is critical of the sentence he received.  This is not the case.  The very next sentence in the email quoted by the government demonstrates Colton's appreciation of the compassion shown by the Island County Superior Court.  Putting aside the question of whether email correspondence between adolescents represents a person's actual feelings on a subject, the chronology of Colton's emails regarding the sentencing hearing shows that he appreciates Judge Churchill's consideration of his upbringing and sensitivity to the lack of in-depth psychiatric and psychological testing prior to Dr. Adler's evaluation.  It is true, that at one point Colton made naïve and glib comments

RESPONSE TO GOVERNMENT'S
SENTENCING MEMORANDUM- 3

LAW OFFICES OF JOHN HENRY BROWNE, P.S.
200 DELMAR BUILDING
108 S. WASHINGTON STREET
SEATTLE, WASHINGTON 98104
(206) 388-0777 • FAX: (206) 388-0780

about whether Judge Churchill's actions matched her words, but as demonstrated by the chronology of emails below, he was simply parroting the opinion of a friend.

On December 25, 2011, Colton describes the sentencing hearing in an email:

"The judge sentenced me to the lowest possible sentence within the standard range, after calling my story 'a triumph of the human spirit.'  December 16 was bittersweet.  I had waited 18 long and stressful months to get to the moment I would have something definite to go off of.  Moreover, though I wont be going home tomorrow, I will be going home sooner rather than later; the bad news of being sentenced was balanced out a bit with recognition by the judge, of the hell I've been through and the situations I emerged from solely out of my passion for life and the continuing pursuit of a dream.  I am thankful for her words… reassured perhaps.  But the greatest solace is in the fact that it is over.  18 months it's over."
Harris-Moore email to G.M., December 25, 2011.

"Court was not enjoyable, but it was a reassuring feeling to have someone in a place like the judge to call my story a triumph of the human spirit.  After the absolute hell I have seen and the impossible situations I've made it through, it's a fundamentally validating feeling to have the passion for life that kept me going recognized by someone in the way it was."
Harris-Moore email to E.A., December 25, 2011

After Colton expressed his appreciation for the sentence he received, the next day, on December 26, 2011, N.P. wrote to Colton and gave her perspective of the December 16 sentencing:

"I am not impressed with what she said about your case.  I mean her words were profound, important, absolutely true, and seemed to really come from her heart.  Yet she didn't have the courage to have her actions CONSISTENT with her words to stand up against overly vengeful prosecutors, to make a powerful statement that's not simply mere words and to sentence you below the range."
N.P. email to Harris-Moore, December 26, 2011.

Colton responded to N.P.'s email on December 29 with this statement:
"It's interesting you have that opinion about the judge and her words meaning more than her actions. … I actually agree with you about that, she had a real opportunity to make a stand and distinguish herself in the process, but didn't live up to the potential she had invested in her by the People to make a difference.  Overall though, I believe she stood up against what the unethical prosecutors had to say.
Harris-Moore email to N.P., December 26, 2011, 5:42 p.m.

RESPONSE TO GOVERNMENT'S
SENTENCING MEMORANDUM- 4

Two and a half hours later, Colton emailed B.D. and parroted N.P.'s view:

"So the citizens (and sheriffs) are appeased, justice is served.  It's all political.  I'm thankful for the judge saying what she did, but at the same time her words were greater than her actions – she had the ability as invested in her by the people to create change and the opportunity to stand up with compassion, but didn't reach that potential.  **I will say that she went out on a limb in saying what she did and giving me the lowest-possible sentence (in the range) and I am forever grateful for that."** (emphasis added to the sentence that the government excluded).
Harris-Moore email to B.D., December 26, 2011, 8:12 p.m.

Upon further reflection, Colton returned to his own view of the sentencing hearing and wrote to K.W. on December 27, 2011:

"As for court, the only feeling/thought I have is peace at knowing that it's finally over.  I went into court not only (seriously) expecting the only sentence I would get was a decade and nothing less, but rather came out with a sentence at the lowest end of the range and having my story called 'a triumph of the human spirit.'"
Harris-Moore email to K.W., December 27, 2011.

## C.      Comments about the police and prosecutors

While it is not clear that Colton's statements about the state police and prosecutors are at all relevant to the question of whether he is remorseful for the harm he caused to the victims, it is worth noting that Colton's label of "unethical" for Island County Prosecuting Attorney Greg Banks is based on an unfortunate misunderstanding. Greg Banks was erroneously quoted as stating that that the Island County Plea Agreement required that Mr. Harris-Moore be sentenced to over nine years.  Colton was upset by that statement and reacted:

"I was on the news again today… just more propaganda.  This time unethical Greg Banks is spreading around a lie that I 'agreed to 9+ years' per the plea agreement.  That's absolutely ridiculous.  For one, I didn't agree to any specific number.  Two, my MAX sentence is 9+ years."
Harris-Moore email to G.M, November 23, 2011.

After that, Colton continually referred to the Island County Prosecutor as "that unethical Greg Banks" in his personal correspondence with his friends.

LAW OFFICES OF JOHN HENRY BROWNE, P.S.
200 DELMAR BUILDING
108 S. WASHINGTON STREET
SEATTLE, WASHINGTON  98104
(206) 388-0777 • FAX: (206) 388-0780

As for Mr. Harris-Moore's comment that Island County Sheriff Mark Brown was the "King Swine," Sheriff Brown was recently quoted as saying "It doesn't offend me at all. I think it's the victims we need to concentrate on." The Sheriff could not be more correct. Colton's history with the Island County Sheriff's Office is long and fraught with distrust on both sides. It is important to remember that Colton's first interactions with the Sheriff's Office as a child were humiliating and degrading. When Colton actually had something of his own, a brand new bicycle, the Sheriff's Office accused Colton, a young child at the time, of stealing it from someone else and actually drove him home in a patrol car to confront his mother about whether the bicycle actually belonged to him. While Colton may not like the Sheriff, he does regret the suffering he caused his victims:

"I know what I did was wrong; I feel bad for the victims and will make things right ANY way I can; am ashamed of myself…"
Harris-Moore email to K.W., December 2, 2011.

"I stole many things from people I didn't know and felt bad about it. Though I didn't stop and turn myself in, I still felt bad about it, and always told myself that I'd make things right sooner or later, but that it would happen."
Harris-Moore email to E.A., December 5, 2011.

### D.    Efforts to Make Amends

The government suggests that Colton's comments about Sheriff Brown, Greg Banks, and Randy Gaylord are indicative of a larger lack of remorse, despite the absence of any negative statements about those who were injured by Colton's actions. That somehow an adolescent's musings to his friends make his Letter to the Court something less than sincere. Colton cares about whether the people whose homes were broken into or whose planes were wrecked are made whole again. In fact, he has agreed to discuss the private details of his childhood and his life on the run with a movie company so that the sale of his story will pay for the damage that was done. If these emails are in fact to be considered the gold standard for judging the thoughts and opinions of a 20 year-old non-violent offender, than the following excerpts must be considered:

"Yes, a movie will likely be made, thought that was NEVER my goal, and I am still not happy about that because doing such a deal means that I release the details of what I feel are very private and personal experiences and memories. Despite the way I feel about it, nobody forced or pressured me to sign the contract. And on top of that, what I want or

LAW OFFICES OF JOHN HENRY BROWNE, P.S.
200 DELMAR BUILDING
108 S. WASHINGTON STREET
SEATTLE, WASHINGTON 98104
(206) 388-0777 • FAX: (206) 388-0780

don't like doesn't really matter.  I feel a sense of responsibility to people on Camano Island and San Juans … they are the ONLY reason I did this."
Harris-Moore email to B.D., August 18, 2011.

"Right now I am in a position to make things right, which involves repaying and giving back to people and the community – to society.  I not only want to do this because of my greater goals, but because it is the right thing to do."
Harris-Moore email to J.A., August 27, 2011.

"When I was first caught, about 16 months ago, one of the first things my lawyer and I discussed was whether or not I would be interested in a book or movie.  I told him 'I wouldn't write a book or do a movie for 30 million dollars.'  I have a very deep protection of details to my life and experiences that have shaped who I am – I believe my experiences belong to me, and should never be made into someone else's mere entertainment.  I felt at the time, and still do, that if I were to sell away details to those profound and life-changing experiences, I would be losing part of myself.  It wasn't until my lawyer asked if I would change my mind to be able to use the proceeds from a movie or book to repay the victims.  When he said that, that's when I changed my mind.  I feel like I have a responsibility to the communities of Camano and Orcas and the victims.  So, you could say I sacrificed what I hold closest to me, for them."
Harris-Moore email to L.M., October 23, 2011.

### E.    Glamourizing his Crimes

Is it possible to glamourize a crime to the public in a private email?   The government takes an email where Colton is excitedly describing a potential job he may have when he is released from custody and cuts it down to be nothing more than a self-aggrandizing comparison to the Wright Brothers.  See Ex. B., Harris-Moore Email to J.F. on August 4, 2011.  Colton expresses that he would like to join the military but doubts that it will have him.  He then goes on to describe a small commuter airline that has communicated with him about his future after incarceration.  He is excited, optimistic, and hopeful.  Colton believes the small business owner:

"Recognizes the things I have done as far as flying and airplanes goes, is amazing. Nobody on this planet have done what I have, except for the Wright brothers.  Moreover, she sees things for what they are, not for what the media presents[.]"
Id.

This kind of optimism indicates that Colton is at a low risk for re-offending and has the will and interest to make a life for himself as a member of the community.  He spends a considerable amount of time telling his friend about his goals and aspirations:

RESPONSE TO GOVERNMENT'S
SENTENCING MEMORANDUM- 7

"Despite violating the law, this time of my life is temporary and will not be what defines me.  My number one goal is to prove to my neighbors here in Washington State, and to those abroad, that the crimes I have done are not a reflection of who I am."
Harris-Moore email to J.A., August 27, 2011.

"When I actually get out, I am going to have to spend night and day fighting my criminal record so I can just get into college and graduate!  All while simultaneously getting my pilots license and ultimately building my company and career.  Ultimately not only getting my life back, but building a new one.  It is a rather tedious or complicated task I have in front of me, but I won't accept ANYTHING less than graduating college, becoming a pilot, and starting Phoenix Aerospace."
Harris-Moore email to N.P., April 14, 2011.

"I am shocked every time I learn something new about my mom or childhood – shocked that I am who I am and like you said, not what someone would expect after being raised like that.  I know the difference between right and wrong, that the world is not full of evil people that want nothing more than to hurt you, that there is in fact more good than bad, that more people are happy and kind.  I am concerned that you might think that my childhood was massively damaging, but the truth is that I made it through it, have a healthy mind of my own, an unstoppable imagination, honorable goals, and am on track to making it through this and living a normal life.  Lesson learned: abide the law."
Harris-Moore email to B.D., August 19, 2011.

"With the Commercial Pilots License (the license you get if you want to fly as a career, for hire) the problem is getting hired by the company.  I wouldn't be able to fly for a national airline.  If I knew the operators in a small company like San Juan Airlines or a corporation, they could recommend me and that problem would be solved.  Where there's a will, there's a way."
Harris-Moore email to C.D., October, 12 2011.

"I've told her [Colton's mother] several times what I want to do… but before that I have to pay off whatever financial obligations I may still have, in addition to the requirements of probation – all of which I look forward to;  the sooner it's done and over, the sooner I can be 100% free!"
Harris-Moore email to E.A., January 28, 2012.

In sum, Colton's emails do not call into question the validity of his statements of remorse.  Quoting and parsing his emails is, frankly, nothing more than an inflammatory attempt to use a cognitively impaired adolescent's thoughts against him.  This defendant is more than the sum of what he types and a few misplaced words are not evidence of a lack of remorse.

RESPONSE TO GOVERNMENT'S
SENTENCING MEMORANDUM- 8

III.   **SPECIAL SKILL ENHANCEMENT**

The government is seeking an enhancement for "use of a special skill" that "significantly facilitated the commission or concealment of the offense" for Counts 2 and 7. <u>See</u> Guidelines section 3B1.3. These counts are for interstate transportation of a stolen aircraft, in violation of 18 U.S.C. §2312. United States Probation agrees with the defense that the special skill enhancement should not be applied in this case. The presentence report notes that despite spending many hours teaching him self how to fly by reading manuals and observing take-offs and landing, the evidence indicates that Mr. Harris-Moore lacked significant skill and is quite fortunate to have survived many of his flights. PSR, ¶ 13.

The special skills enhancement is inappropriate for several reasons: (1) Mr. Harris-Moore did not receive any substantial education, training, or licensing to enable him to commit the offenses; (2) Mr. Harris-Moore was not a "pilot" before he committed the offenses; and (3) Mr. Harris-Moore did not have access to any educational materials beyond what is accessible to the general public.

The Application Note to 3B1.3 states:

> "Special Skill" refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include pilots, lawyers, doctors, accountants, chemists, and demolitions experts.

Guidelines section 3B1.3, Application Note 4.

1.   **"Substantial education, training or license"**

First, Mr. Harris-Moore did not receive any *substantial* education, formal training, or any license that would enable him to possess a special skill for flying airplanes. The government places emphasis on the word "usually" when quoting the guideline ("special skill refers to a skill…*usually* requiring substantial education, training or licensing"). <u>See</u> Govt's Sentencing Memorandum, pg. 25 (Dkt. #57). The guideline, however, clearly requires more than self-taught education by indicating that a "*substantial* education and training" is required. This is beyond any level of knowledge that Mr. Harris-Moore possessed when he unlawfully piloted single-engine airplanes.

In the midst of Mr. Harris-Moore's life on the run, he began to follow the aviation traffic at the Orcas Island Airport. He became familiar with airplane instruments by

RESPONSE TO GOVERNMENT'S
SENTENCING MEMORANDUM- 9

reading airplane manuals and watching the planes take off and land. He sometimes listened to airport frequencies. These actions were more the curiosity of a 18-year-old with a love of airplanes rather than any form of education or training. Mr. Harris-Moore never took an education course relating to airplane navigation, nor did he ever obtain any meaningful training material that enabled him to fly. Instead, Mr. Harris-Moore piloted the airplanes with trepidation and with belief that he could crash at any moment.

Although it is miraculous that Mr. Harris-Moore was able to fly several airplanes without major harm to him or others, this element of luck should not be construed to be a special skill.

If Mr. Harris-Moore had acquired even a basic education or training associated with pilot skills, he would not have piloted the aircraft in such hazardous and risky conditions. During his first flight experience from Orcas Island, Washington to an area outside to Yakima, Washington, Mr. Harris-Moore describes the conditions:

> "[That] experience became the single most defining event and terrifying day of my life. The conditions were such that an experienced pilot would have known not to fly. However, I was not only untrained and inexperienced, but blissfully unaware of the severity of the weather that morning."

Defense Sentencing Memorandum (Dkt. #56), Ex. E. This flight was extremely dangerous and could have easily resulted in Mr. Harris-Moore's death. Mr. Harris-Moore also indicated that his inexperience caused the airplane to stall and begin spinning to the ground. Mr. Harris-Moore had not, in his cursory knowledge of airplane operation, ever read anything in detail about spin recovery. Reflecting on this day, Mr. Harris-Moore states, "I remain somewhat amazing that I am still alive. … having made it out of a situation all odds said I shouldn't have." Id.

### 2. Mr. Harris-Moore is not a "pilot"

Second, despite the fact that he flew numerous planes, Mr. Harris-Moore is not a pilot. The guideline application notes give examples of instances where there was "substantial education, training or license" sufficient to warrant a special skill enhancement. This list includes "*pilots*, lawyers, doctors, accountants, chemists, and demolition experts." Guidelines section 3B1.3, Application Note 4 (emphasis added). The list of examples demonstrating "special skill" do not compare to Mr. Harris-Moore's

LAW OFFICES OF JOHN HENRY BROWNE, P.S.
200 DELMAR BUILDING
108 S. WASHINGTON STREET
SEATTLE, WASHINGTON 98104
(206) 388-0777 • FAX: (206) 388-0780

ineffectual flights. All of the examples require a substantial education program, testing and licensing requirements, as well as years of training to obtain a professional title. These examples are a stark contrast to Mr. Harris-Moore's status.

Cited in the government's memorandum is United States v. Corona-Verbana, 509 F.3d 1105, 1120-21 (9th Cir. 2007). See Govt's Sentencing Memorandum, pg. 26 (Dkt. # 57). In Corona-Verbana, the special skill enhancement was applied when an architect helped construct a drug smuggling tunnel.

That court stated:

> We apply a two-part test to determine whether or not a skill constitutes a "special skill" within the meaning of the guidelines. First, we determine whether the skill is possessed by members of the general public. Second, we determine whether the skill requires substantial training, education or licensing, and *is analogous to the skills described in the application note*.

Id. at 1120, citing United States v. Lee, 296 F.3d 792, 795 (9th Cir.2002) (emphasis added). The Corona-Verbana court went on to explain that: "Because all require substantial education, the skill of an architect is analogous to those of pilots, lawyers, doctors, accountants, and demolition experts." Id. at 1121. In contrast, Mr. Harris-Moore's limited understanding of how to fly an airplane, gathered from reading pamphlets and watching a DVD, is not "substantial education." Thus, his situation is not analogous to this case, despite the government's characterization.

There are cases that support the application of the special skill enhancement when the defendant has flown an airplane, however, all of the cases apply the enhancement to actual, licensed pilots. See e.g., United States v. Mettler, 938 F.2d 764 (7th Cir. 1991) (application of special skills enhancement is appropriate when a professional pilot uses his skills in a conspiracy to deliver cocaine). Moreover, for a professional pilot even the specialized academic knowledge of how to prepare a plane for flight, *how to fuel an aircraft* (a skill not acquired by Mr. Harris-Moore), and how to file a flight plan is enough to warrant a special skills enhancement before the plan was ever flown—so long as the defendant is an actual pilot. United States v. Culver, 929 F.2d 389 (8th Cir. 1991).

It is clear from a review of the relevant cases that to hold a defendant as having a special skill for being a "pilot" means that the defendant is a professional pilot who uses his education and training in the commission of the charged offense. In contrast to the

RESPONSE TO GOVERNMENT'S
SENTENCING MEMORANDUM- 11

LAW OFFICES OF JOHN HENRY BROWNE, P.S.
200 DELMAR BUILDING
108 S. WASHINGTON STREET
SEATTLE, WASHINGTON 98104
(206) 388-0777 • FAX: (206) 388-0780

defendant in <u>Culver</u>, Mr. Harris-Moore did not plan for fuel when he navigated five airplanes and, instead, would be forced to crash land because he ran out of fuel. Mr. Harris-Moore never organized a flight plan or engaged in typical protocol as a professional pilot would. Instead, Mr. Harris-Moore perilously flew airplanes at a risk to himself and others.

To be a "pilot" Mr. Harris-Moore would have needed substantially more education and training. To obtain a pilot certificate, the Federal Aviation Administration requires a pilot to undergo a course of training with a certificated instructor, accumulate and log specific aeronautical experience, and pass a three-part examination: a knowledge test (a computerized multiple-choice test, typically called the "written test"), an oral test, and a practical test carried out by an FAA inspector. Mr. Harris-Moore never came close to the amount of training and education necessary to be a "pilot" in the sense of having acquired a special skill.

### 3. "A skill not possessed by members of the general public"

The advisory guideline enhancement of special skill was meant to apply to those criminal acts that are facilitated by a preexisting skill that acquired through formal education and/or training.  In contrast, Mr. Harris-Moore did not have any preexisting skills that he used to facilitate interstate transportation of a stolen aircraft.  Instead, he was in the midst of his criminal acts and life on the run when he began to research basic information about airplanes.  In fact, he learned how to fly airplanes *during* the commission of these crimes.  Thus, there is plainly no "skill" that Mr. Harris-Moore had to facilitate his flights.

In an analogous case the Ninth Circuit has held that cheating at cards does not constitute a special skill because it is useless outside the criminal context. <u>United States v. Liang</u>, 362 F.3d 1200, 1203 (9th Cir. 2004). Similarly, Mr. Harris-Moore deliberately avoided licensing, training and education so that he could illegally steal airplanes. The bare minimum skills that he did gain were useless outside the criminal context because they would not enable him to *legally* fly an airplane.  To be able to legally navigate an airplane, Mr. Harris-Moore would have to be certified by the Federal Aviation Administration.

RESPONSE TO GOVERNMENT'S
SENTENCING MEMORANDUM- 12

LAW OFFICES OF JOHN HENRY BROWNE, P.S.
200 DELMAR BUILDING
108 S. WASHINGTON STREET
SEATTLE, WASHINGTON 98104
(206) 388-0777 • FAX: (206) 388-0780

**IV.   THE SUGGESTED RANGE OF 63 TO 78 MONTHS TO RUN CONCURRENT TO THE ISLAND COUNTY SENTENCE**

United States Probation has appropriately calculated Mr. Harris-Moore's criminal history category at IV.  PSR, ¶ 104.  This yields an advisory sentencing guideline range of 70 to 87 months.  The PSR also notes that this range is different from the suggested sentencing range agreed upon by the parties in the plea agreement.  PSR, ¶ 144.  The range suggested in the plea agreement is appropriate because it takes into the fact that the state charges arising from the same course of conduct are counted as three points in the criminal history simply because the state sentencing was completed one month prior to the pending federal sentencing.  Had the order of the sentencing hearings been reversed, the criminal history category would have been category V and the range agreed upon by the parties would actually be higher than the advisory range.  In any case, the defense suggestion of a sentence of 70 months and the probation suggestion of a sentence of 78 months are both within the advisory sentencing guideline range as calculated by United States Probation.

The parties jointly recommend that any sentence imposed in this case be ordered to run concurrent with the 87-month sentence imposed in Island County Superior Court on December 16, 2011. Mr. Harris-Moore will begin serving the state sentence on March 22, 2012.  Because the Island County sentence is an undischarged term of imprisonment that – while considered as part of the same course of conduct as the instant offenses - did not result in an increase in the base offense level in this case, the applicable advisory guideline is Section 5G1.3(c) which reads as follows:

> (c) (Policy Statement) In any other case involving an undischarged term of imprisonment, the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense.

The determination of what constitutes a reasonable punishment is then governed by the factors set forth in 18 U.S.C. § 3553(a).  See 18 U.S.C. § 3584.  Most pertinent to this case is the nature and circumstances of the offense.  18 U.S.C. § 3553(a)(1) and (2).

RESPONSE TO GOVERNMENT'S
SENTENCING MEMORANDUM- 13

LAW OFFICES OF JOHN HENRY BROWNE, P.S.
200 DELMAR BUILDING
108 S. WASHINGTON STREET
SEATTLE, WASHINGTON 98104
(206) 388-0777 • FAX: (206) 388-0780

The circumstances under which these offenses came about are the same circumstances that lead to the commission of the offenses to which Mr. Harris-Moore pleaded guilty in Island County. Mr. Harris-Moore's course of conduct began on the day he left the Griffin Home and ended with his arrest in the Bahamas in July of 2010. In the intervening months, Mr. Harris-Moore committed the string of burglaries and thefts accounted for in the state prosecution and while traveling that same path and interspersed with the state offenses, he committed the federal offenses that are the subject of this case. It is one continuing course of conduct that is appropriately punished by accepting Mr. Harris-Moore's responsibility for the individual offenses and treating the sentences between the two jurisdictions as one over-arching punishment that should be served simultaneously. To that end, the defense and the prosecutors in Island County, San Juan County, Snohomish County, and the United States Attorney's Office have all agreed that it is appropriate in this case for the state sentence and the federal sentence to be served concurrently. A reasonable punishment for the instant offenses is a sentence in the range of 63 to 78 months to be served at the same time as the longer Washington state sentence of 87 months.

## V. ALLEGATION THAT HARRIS-MOORE PEPPER SPRAYED A DEPUTY

Throughout the pendency of the cases in San Juan County, Island County, and Snohomish County, no one has ever claimed that Mr. Harris-Moore is a violent offender who uses "force" against police and civilians. San Juan County never charged Mr. Harris-Moore with assaulting a police officer with pepper spray. The issue was never raised. Yet now, in the federal government's sentencing memorandum, the allegation is made for the first time that "Mr. Harris-Moore used force" and injured a police officer by assaulting him with pepper spray. Id. at 5. This allegation is a gross exaggeration.

On September 25, 2008, Deputy McKinney with the San Juan County Sheriff's Office sat in a chair in the living room of a private residence waiting to see if the person who broke into that residence a month earlier and ordered a cell phone to be delivered there would show up to pick up the phone. Ex. A, McKinney Report. The cell phone was being used as "bait." Colton showed up and entered the residence. The deputy told him to get on the ground and started to draw his taser. Colton "bolted" out the door and ran away. The deputy gave chase but was unable to get within taser range. Later, when

RESPONSE TO GOVERNMENT'S
SENTENCING MEMORANDUM- 14

LAW OFFICES OF JOHN HENRY BROWNE, P.S.
200 DELMAR BUILDING
108 S. WASHINGTON STREET
SEATTLE, WASHINGTON 98104
(206) 388-0777 • FAX: (206) 388-0780

the deputy re-entered the residence, he "detected an odor of pepper spray." The deputy believed he had not discharged his own pepper spray—even though he was pulling out his taser and pursuing the fleeing suspect. Nor did the deputy see or hear "any other device discharged" at the time Colton "bolted" from the residence. Based on this account of events, the government claims that Mr. Harris-Moore used "force" by pepper spraying a deputy.

All the "bait" incident can tell us is that Colton fled immediately upon seeing the deputy, the deputy was getting out his taser and chasing Colton, the deputy did not see or hear Colton activate a pepper spray canister, and it is unclear as to how the smell of pepper spray was later registered by the deputy when he re-entered the residence. This is not evidence of the use of "force."

DATED this 25th day of January 2012.

Respectfully submitted,

LAW OFFICES OF JOHN HENRY BROWNE, P.S.

s/ Emma C. Scanlan
JOHN HENRY BROWNE, WSBA #4677
EMMA C. SCANLAN, WSBA #37835
EMILY M. GAUSE, WSBA#44446
Attorneys for Colton Harris-Moore
108 S. Washington Street, Suite 200
Seattle, Washington 98104
206-388-0777  fax: 206-388-0780
e-mail: escanlan@jhblawyer.com

RESPONSE TO GOVERNMENT'S
SENTENCING MEMORANDUM- 15

LAW OFFICES OF JOHN HENRY BROWNE, P.S.
200 DELMAR BUILDING
108 S. WASHINGTON STREET
SEATTLE, WASHINGTON  98104
(206) 388-0777 • FAX: (206) 388-0780

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 25th day of January, 2012, I electronically filed the foregoing with the clerk of the court using the CM/ECF system, which will send notification of such filing to the attorneys of record for the parties. I hereby certify that I have served any other parties of record that are non CM/ECF participants via Tele-fax/US postal mail.

Dated this 25th day of January 2012.

s/ Lorie Hutt
Lorie Hutt, Administrative Assistant
JOHN HENRY BROWNE, #4677
Counsel for the Defense
108 S. Washington Street, Suite 200
Seattle, Washington 98104
Phone: 206-388-0777
Fax: 206-388-0780
Email: lorie@jhblawyer.com

RESPONSE TO GOVERNMENT'S
SENTENCING MEMORANDUM- 16

LAW OFFICES OF JOHN HENRY BROWNE, P.S.
200 DELMAR BUILDING
108 S. WASHINGTON STREET
SEATTLE, WASHINGTON 98104
(206) 388-0777 • FAX: (206) 388-0780